In the Interest of Joshua Allen MANN, a Juvenile.

Janis Lynn FISHER, Appellant,

v.

William Elliot MANN, Appellee-Cross-Appellant.

No. 64086.

Supreme Court of Iowa.

June 18, 1980.

Robert C. Oberbillig, Diane L. Dornburg and Dennis J. Kirkwood, Des Moines, for appellant.

John F. Sprole and Mercer & Mercer, Des Moines, for appellee-cross-appellant.

Considered by REES, P. J., and UHLENHOPP, McCORMICK, McGIVERIN, and LARSON, JJ.

McCORMICK, Justice.

This is another custody case which would severely test the wisdom of Solomon. William Elliot Mann and Janis Lynn Fisher are the natural parents of Joshua Allen Mann, born February 26, 1973. The parents' marriage was dissolved in Oregon in 1978, and the Oregon court decided that Joshua's custody should be determined by Iowa courts. Each parent petitioned for custody in the present action, but the trial court denied the petitions and placed Joshua with Robert and Anita Mann, his paternal uncle and aunt. In this appeal Janis contends she should have been given Joshua's custody; William contends the decree was correct but has cross-appealed for custody in the event we upset the decree. We reverse and remand on the appeal and affirm on the cross-appeal.

This case was brought under the provisions of the Uniform Child Custody Jurisdiction Act, chapter 598A, The Code. Jurisdiction to make an award of custody stems from section 598A.3(1)(d) which provides for jurisdiction when "another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and it is in the best interest of the child that [a court of this state] assume jurisdiction." The Oregon court which dissolved the marriage of the parties found it was an inconvenient forum and Iowa was the appropriate forum for determination of custody pursuant to Oregon's counterpart of section 598A.7.

The controlling questions presented are whether the court had authority to award Joshua's custody to Robert and Anita, whether the procedures utilized by the court denied Janis due process of law in violation of U.S. Const. Amend. XIV, and whether the award was in Joshua's best interests.

I. *The court's authority.* No doubt can exist of the authority of the court to award custody of a child to a stranger to the action:

> The divorce courts have the power to award custody of a minor child to a stranger to the action, such as a grandmother or an aunt. If both parents are unfit, or if the only parent who contests the issue with a stranger is unfit, custody is properly awarded to a stranger to the action for divorce. It has been recognized moreover, that even though a parent is fit to have custody, he may be denied custody if this is clearly inimical to the best interests of the child.

*In re Marriage of Smith,* 269 N.W.2d 406, 408 (Iowa 1978). Although this principle is enunciated in the context of an original

award of custody in a divorce action, it is equally applicable in an action like the present one which is brought to have an original award of custody made when the dissolution decree does not decide the issue.

■ When this principle applies, the burden is on the third person to prove the unsuitability of the parents. "[T]he dissolution court should ordinarily award custody to a parent[,] and a strong case to the contrary must appear before the court should do otherwise." *Id.* at 408–09.

This case does not present the jurisdictional problem involved in *In re Marriage of Carrico*, 284 N.W.2d 251, 255 (Iowa 1979), and *In re Marriage of Snyder*, 276 N.W.2d 402, 405–06 (Iowa 1979). The court did not make an adjudication which could be made only under the juvenile law in a juvenile proceeding.

■ We hold that the court did not lack jurisdiction to award Joshua's custody to Robert and Anita.

II. *Procedural due process.* Janis contends the trial court denied her due process by not permitting her an opportunity to litigate the propriety of the award of custody to Robert and Anita.

The placement of Joshua was not the idea of Robert and Anita but originated with the court. After Robert testified in support of William's petition for custody, the judge called Robert into chambers and interrogated him in the presence of only the court reporter about his willingness to accept custody of Joshua. The judge said he excluded counsel because he did "not want to particularly tip his hand" as to what disposition he was considering. After determining that Robert was willing to accept custody, the judge cautioned him not to tell anyone other than his wife about the discussion.

The trial resumed. At the conclusion of their evidence, the parties proposed a settlement to the court under which custody would be split, Janis to have Joshua for nine months, through the school year, and William to have him for three months. The court told them it would not approve the agreement and tentatively proposed to place Joshua in foster care with Robert and Anita rather than award his custody to either parent. The judge then told counsel for the first time that he had discussed this issue with Robert. He authorized the reporter to read to counsel the record of his ex parte conversation. Counsel for William objected to the ex parte discussion, but counsel for Janis did not complain about it. The parties were then given an opportunity to question Robert and Anita about their qualifications and background. Neither party asked for a continuance or sought to introduce additional evidence.

After the court's decree was entered, Janis moved for new trial through different counsel, urging her due process objection for the first time. In overruling the motion for new trial, the court rejected the due process contention. We will assume, without deciding, that error was adequately preserved on this issue.

■ However, we find no denial of due process. The court gave Janis notice and opportunity to offer evidence and be heard on the proposed disposition. She was thus given an opportunity to litigate the issue. Because she did not ask for a continuance or register any other complaint at the time, she has not established an excuse for failing to take full advantage of that opportunity. Having had the opportunity, she was accorded due process. *See Patten v. Patrick*, 276 N.W.2d 390, 393–96 (Iowa 1979).

This does not mean we endorse the procedure employed by the court. Judicial proceedings must not only be fair; they must also appear to be fair. The appearance of fairness was subverted by the court's ex parte discussion with Robert, even though it was recorded and later revealed to the parties. It put the parties in the position of trying one issue without knowing the judge was secretly considering another issue. It was also inconsistent with the tradition of openness upon which our system of justice depends. Although we do not reverse on the due process claim, we disapprove of the court's ex parte discussion with Robert.

III. *The merits of the case.* It appears that the custody award may have been intended to be temporary. The decree provided that "the foster care, custody and control of Joshua Allen Mann be . . . awarded to Robert and Anita Mann pending further order of this Court. The Court specifically retains jurisdiction to consider later changes in custody." In overruling Janis' motion for new trial, the court said the placement in "foster care" was in Joshua's best interest then added: "It is not in any way indicated or intimated in the Court's ruling that such placement is of such a permanent basis that it could not be changed on showing substantial change in circumstances."

█ Remarks of the court at trial also indicate the disposition might be only temporary. The court encouraged both parents to seek to regain custody later, presumably if either thought a better case could be made. To the extent this disposition was contemplated as only a temporary solution, it violates the precept that "a permanent arrangement for the child should normally be decreed." *Shipley v. Shipley*, 182 N.W.2d 125, 127 (Iowa 1970). We have said: "Custody decisions are difficult, but we are committed to the principle that the status of children should be quickly fixed and thereafter little disturbed." *In re Marriage of McFarland*, 239 N.W.2d 175, 179 (Iowa 1976). The lack of permanency is one reason we disapprove of the custodial decision here.

However, the main reason we disagree with the decision is that we believe the record does not contain the necessary strong showing that neither parent would be a suitable custodian.

In finding Janis unsuitable, the court relied on three factors. The main one was the fact she was living in Oregon with a man to whom she was not married. The second factor was the unstable and unsettled life-style Janis had maintained during the first three years of Joshua's life. The third factor was the extra burden carried by Janis in having to care for a handicapped child born as a result of her relationship with the man with whom she had lived in Oregon for approximately two years.

William was rejected as a suitable custodian primarily because of instability suggested by a suicide attempt in December 1978 and his failure to seek psychiatric or psychological help afterward. The court also considered the fact that a woman to whom he was not married lived with him during the summer of 1979 and was staying with him on weekends.

Janis and William had married when she was fifteen and he was eighteen. They lived together only a short time. For the first three years of Joshua's life, Janis traveled around the country with him, sometimes using poor judgment and exposing him to detrimental influences and risks. However, she does not appear to have neglected him even during this period of instability. In approximately the summer of 1976, she settled in Newport, Oregon, where she still lived at the time of trial. She was pregnant when she moved to Oregon and gave birth to a son, Jesse, in early 1977. The father was a man she had met in Florida.

In March 1977 Janis asked William to take care of Joshua for a couple of months. William ended up keeping Joshua with him for about twenty months. William refused to return him to Janis when asked to do so in the summer of 1977. This evidently led Janis to initiate the Oregon dissolution case. She asked for Joshua's custody in that action, but, on William's motion, the court dismissed that portion of her petition under the UCCJA. The Oregon court dissolved the marriage in August 1978. Janis visited Joshua several times in Des Moines and took him back to Oregon with her after William's suicide attempt in December 1978. She still had his care at the time of the September 1979 trial.

While in William's care, Joshua was enrolled in an Urbandale preschool for the 1977–1978 school year. The teacher testified:

He did very well. He acclimated very quickly. He was a very social child. He

enjoyed his peers. He was very imaginative. Extremely dramatic in his choice of equipment to use. He was very physical, very strong on the large playing equipment outdoors and related to his peers very well. Seemed very happy and very cooperative. He took directions from me as an adult, as his teacher, very well.

Joshua attended kindergarten in the West Des Moines system in the fall of 1978. William did not respond to notes attempting to set up conferences, and Joshua spent considerable time at home alone while William was working. Janis, visiting from Oregon, went to Joshua's school on three occasions, helping in the classroom and participating in open houses.

In 1978 Janis gave birth to a son, Ezra, fathered by the man with whom she was living in Oregon, Jack Matty. Ezra was born with hydrocephalus and a cleft palate. Janis had refused to consider an abortion even though she was warned the baby would be born with a severe handicap.

At the request of William's counsel, an officer of the Polk County juvenile department requested and obtained a comprehensive report on Joshua's home situation in Oregon from a counselor with the Oregon juvenile court. This report, which was quite favorable to Janis, was received in evidence after the trial court overruled a hearsay objection urged in behalf of William.

The Oregon juvenile officer had conducted an extensive investigation, including an unannounced home visit, review of social service records, and interviews with Janis' caseworker, a public health nurse, and several neighbors. Regarding Joshua's relationship with his half brothers and Jack Matty, the counselor said:

Joshua and Jesse give much attention to Ezra and the three boys seem quite close. Joshua has many friends his own age in the neighborhood. He attended a local preschool and looks forward to beginning the first grade in September with his friends. The boys care a lot for Jack and he for them. Joshua in particular goes fishing with Jack and assists in the building projects. Jack seems in all respects, a competent, caring parent.

Jack was described as a "fisherman and carpenter." The investigator noted Ezra's delicate condition and demands on Janis' time. However, he said Joshua and Jesse did not lack attention.

After detailing his findings, the counselor concluded his report with this summary:

I observed Joshua to be a happy, healthy, [exuberant] young man of 6. He is quite well mannered. He has close ties with his family unit in Newport, and with the community itself through friends. According to all reports he is well cared for and well supervised. Professionals working with the family feel the parenting is of high quality. If not for the present proceeding there is no apparent reason for any agency or Court to consider removing Joshua from his present environment.

Janice Tidrick, the Polk County juvenile officer who requested the report, said Joshua appeared to be receiving adequate care in Janis' home. She saw nothing in the report which would give her serious concern, although she would be more comfortable if she had conducted the investigation herself.

The evidence relating to William indicated he had not provided financial support for Joshua except for the time Joshua resided with him. His life for the first few years after Joshua's birth had been unsettled, although by the time this case was tried he had completed an area college associate degree program and held regular employment. He said he was depressed about financial and personal problems when he attempted to take his own life. However, he changed his mind in time for his life to be saved. Witness Tidrick said that based on an interview with William she believed at the time of trial he was a stable person who was concerned about his son.

In contrast to Janis and William, Robert and Anita appeared to have had a secure and stable ten-year marriage. They held master degrees in education and were

teachers. They had two children, were expecting a third, and were more than willing to make a loving home for Joshua.

■ In resisting Janis' appeal, William asserts that the probative value of the Oregon report is affected by the fact it is hearsay. He does not contend that the court's ruling admitting the report was error. Therefore we need not determine whether the court erred in overruling his objection to it. The report is plainly hearsay. *See In re Delaney*, 185 N.W.2d 726, 730 (Iowa 1971). We do not decide whether authority for admissibility of the report was established under section 598A.19, providing for the obtaining of such reports, or section 622.28, providing the business record exception to the hearsay rule. Because the issue of admissibility is not presented we consider the report for what it is worth, taking into account its hearsay nature. *See In re Marriage of Joens*, 284 N.W.2d 326, 329 (Iowa 1979). We also consider the fact that Janis testified in person concerning her situation in Oregon, and she was thoroughly cross-examined.

■ Under the whole record, it is inescapable that the trial court was influenced to award Joshua to Robert and Anita more because they would make such a good home for him than because of any evidence of unsuitability of Janis and William. If Robert and Anita had not been in the picture, we find it difficult to believe the court would not have awarded Joshua's custody to one of the parents. If that is true, the court was mistaken in not awarding custody to one of the parents despite the availability of Robert and Anita. In original dissolution custody proceedings, or in independent original custody proceedings under chapter 598A, it is only when neither parent is a suitable custodian that an alternative should be considered. *See In re Marriage of Smith*, 269 N.W.2d at 408. Because of the presumptive preference for parental custody we have warned: "Courts are not free to take children from parents simply by deciding another home offers more advantages." *In re Burney*, 259 N.W.2d 322, 324 (Iowa 1977).

■ We do not believe Janis is correct in contending the trial court ruled against her custody claim solely because she and Jack Matty were living together though not married. As it was entitled to do, the court considered this factor along with other relevant factors. Applicable principles are discussed in *Hagen v. Hagen*, 226 N.W.2d 13, 15–16 (Iowa 1975), where similar conduct was held to be insufficient basis for removing children from a mother's custody. *See also In re Marriage of Morton*, 244 N.W.2d 819, 820–21 (Iowa 1976). Even though we do not believe the court erred in the respect claimed, we are convinced that the factors considered by the court were of insufficient cumulative weight to defeat Janis' petition for custody.

■ We find that under all the evidence it was in Joshua's best interest that Janis be awarded his custody. Aside from Janis' relationship with Matty, the court was motivated in part by her unstable life-style for the first three years of Joshua's life. However, she introduced persuasive evidence that this problem was in the past and not likely to recur. She was little more than a child herself when those events occurred, and the record shows she matured considerably in the two or three years prior to trial. Parents are not to be denied custody for past indiscretions which do not demonstrate a present risk.

The remaining factor which influenced the court was the burden of Ezra's care. However, Ezra had undergone surgery which had the effect of making his care less demanding on Janis, and no evidence was offered to suggest that her devotion to Ezra would make her less attentive to Joshua's needs. In fact, as sometimes happens, the burden of a handicapped child appeared to be drawing the family together.

Even though we do not hold that William would not be a suitable custodian, we find the record shows a better case for Janis to have Joshua's custody. We hold that Joshua's long-range best interests require that his custody be awarded to Janis.

Therefore we reverse and remand on her appeal and affirm on William's cross-appeal. On remand the trial court shall enter an appropriate decree awarding Janis custody and fixing reasonable visitation rights for William. We believe summer visitation should not exceed three weeks in duration as opposed to the three months proposed by the parties when they attempted to resolve the dispute by agreement at trial.

REVERSED AND REMANDED ON APPEAL; AFFIRMED ON CROSS-APPEAL.