In re the MARRIAGE OF Terry Lee RESCHLY and Shirley Sue Reschly.

Upon the Petition of Terry Lee Reschly, Appellant,

And Concerning Shirley Sue Reschly, Appellee,

Roger Lee Cavin and Delores Sue Cavin, Intervenors-Appellees.

No. 67438.

Supreme Court of Iowa.

June 15, 1983.

Emmit J. George, Jr., of Johnston & George, Iowa City, for appellant.

John Wehr, Sigourney, for appellee.

Thomas M. Walter of Johnson, Bauerle, Hester & Walter, Ottumwa, for intervenors-appellees.

Considered by REYNOLDSON, C.J., and UHLENHOPP, McGIVERIN, LARSON, and SCHULTZ, JJ.

REYNOLDSON, Chief Justice.

In this marital dissolution case the father and the maternal grandparents fight for the custody of two children. Trial court granted custody to the grandparents. Iowa Court of Appeals affirmed by a divided vote. We granted further review and now affirm.

Petitioner Terry Lee Reschly and respondent Shirley Sue Reschly were married in 1975. A daughter, Shawna, was born in 1975; a son, Shannon, in 1977.

August 9, 1979, Terry petitioned to dissolve his marriage to Shirley, requesting custody of Shawna and Shannon. Their maternal grandparents, Roger and Dolores Cavin, sought custody through a petition of intervention. Shirley filed an answer admitting the allegation of the petition of

intervention and praying that custody be awarded to her parents.

March 31, 1981, trial court entered a partial decree, terminating the marriage and determining property rights. Issues relating to custody, child support and visitation were reserved. October 8, 1981, following several trial days, the court filed its final decree awarding custody to the Cavins. Neither parent was required to pay child support. There is no appeal from the support and visitation provisions. Only child custody is at issue here.

I. The rules and legal principles we apply are well established. Our review in this equitable proceeding is de novo. Iowa R.App. P. 4. We give weight to trial court's findings, particularly when considering credibility of witnesses, but are not bound by them. Iowa R.App. P. 14(f)(7). The paramount consideration in any custody dispute is the best interests of the child. Iowa R.App. P. 14(f)(15).

The relevant factors that guide our analysis were laid out in *In re Marriage of Winter,* 223 N.W.2d 165, 166–67 (Iowa 1974).[1]

 There is a presumptive preference for parental custody and it is only when neither parent is a suitable custodian that an alternative should be considered. *In re Mann,* 293 N.W.2d 185, 190 (Iowa 1980); *In re Marriage of Smith,* 269 N.W.2d 406, 408 (Iowa 1978). "Courts are not free to take children from parents simply by deciding another home offers more advantages." *In re Burney,* 259 N.W.2d 322, 324 (Iowa 1977).

On the other hand, where non-parents have carried their burden to prove the unsuitability of the parents to have custody, we have awarded custody to such persons if they qualify under a *Winters*-type analysis. *See, e.g., In re Marriage of Corbin,* 320 N.W.2d 539, 545 (Iowa 1982) (foster parents); *In re Marriage of Smith,* 269 N.W.2d at 407, 409 (paternal uncle); *Childres v. Childres,* 257 Iowa 1132, 1138, 136 N.W.2d

268, 272 (1965) (paternal uncle and aunt); *Stevenson v. McMillan,* 250 Iowa 737, 744, 95 N.W.2d 719, 724 (1959) (maternal uncle and aunt); *Herr v. Lazor,* 238 Iowa 518, 529, 28 N.W.2d 11, 17 (1947) (grandparents); *Jensen v. Jensen,* 237 Iowa 1323, 1323–24, 25 N.W.2d 316, 317 (1946) (grandmother); *Schnor v. Schnor,* 235 Iowa 720, 724, 17 N.W.2d 375, 376–77 (1945) (grandparents); *Oliver v. Oliver,* 216 Iowa 57, 59, 248 N.W. 233, 235 (1933) (paternal grandmother).

II. Thus we turn to characteristics and qualifications of the persons available to take custody of Shawna and Shannon.

As we have indicated, the mother, Shirley, is not seeking custody. She admitted the allegation in the petition of intervention that neither parent has "the ability, maturity or financial resources to raise and care for said minor children." Although she commendably is working as a certified nurse's aide, she testified she could not support the children.

The father, Terry, was twenty-five years of age at time of trial. He had a history of law violation, drug abuse, and inability to hold employment. He was treated by a psychiatrist on four occasions when he was sixteen or seventeen years old as a result of allegations that he and a companion attempted to commit sodomy on a small boy in a Washington, Iowa, park. On this trial Terry testified he was drunk at the time and thus did not know what actually happened.

In 1974 Terry stole money and personal property from a mobile home and was convicted of a felony. He successfully completed probation only because he was not caught selling drugs. Between 1975 and 1977 he broke into several residences, stealing money and property. He illegally entered an implement dealership and a Ford dealership, all in Washington, Iowa.

Terry testified he had used LSD, marijuana, amphetamines, hashish, cocaine and barbiturates. He smoked and consumed marijuana and hashish in the presence of

---

1. Effective July 1, 1982, following trial of this case, certain factors were codified at what is now Iowa Code section 598.41 (1983). *See* Act

May 17, 1982, ch. 1250, § 2, 1982 Iowa Acts 456. We would reach the same result in this case under either set of factors.

his children, who knew he kept his supply under a chair in his home. He was treated for drug overdose in 1976 or 1977. In 1979 he attempted suicide through drug overdose. Terry sold drugs from 1976 to October of 1979, a time after he commenced this dissolution proceeding. When questioned whether he reported the profit on his income tax returns he claimed the fifth amendment. Terry wrote bad checks but was never prosecuted for this activity.

Terry had a spotty employment record. He was fired from a job with the City of Washington for stealing flowers from a grave. He was fired from a Hy-Vee food store for physically restraining a female checker from returning to her station. He worked for Perfex at Washington, Iowa, where he used and sold drugs on the job. He was fired from that employment in January 1980 for driving a forklift truck to the break room to take a scheduled break. He then continued a part-time job with Systems Unlimited, a group home until August 1980, when he left after a "mutual agree[ment]" with his supervisor. He secured employment from, and was "laid off" by several other employers. In 1981 he worked for four months as a product salesman for Texas Refining Corporation. In January he earned $60; in February $30; nothing in March; and $6 in April. At time of this trial he had been employed as a product salesman in the north half of Henry County for Central Petroleum Company and had netted a $26.60 profit in two weeks.

The record discloses Terry received ADC payments at various times. Commencing January 1981 he was receiving $360 per month in ADC and $107 in food stamps. His live-in girlfriend, Vicki, was receiving ADC payments of $292. She cared for a young son in the home Terry and she were buying on payments in Brighton, Iowa. Vicki was pregnant with a child fathered by Terry. Although Terry was divorced March 31, 1981, he and Vicki waited until four days before the May 7, 1981, continued trial date to marry. On cross-examination Terry conceded, in essence, that this was done to change their status for the benefit of the trial record.

The evidence further revealed a procession of unsavory or violent persons visited and lived in Terry's house. The police were called when one occupant threatened suicide with a knife when the children were in the home. A person nicknamed "Birdman" would come to the home drunk and on one occasion "spit up" on the floor. Another visitor nicknamed "Rooster" also came in a drunken condition and once appeared with others to assault Terry while the children were home. Several females, each with one or more children, also lived in the home for various intervals of time.

Terry left the children with a baby-sitter whose home was notoriously dirty and whose nineteen-year-old daughter was engaged in a sexual liaison with a fourteen-year-old boy on probation. Shawna reported the sitter's twelve-year-old son had laid on top of her while both were naked. The sitter had a live-in boyfriend. Terry was still leaving the children with this sitter at time of trial. Terry knew another baby-sitter he employed was using marijuana and had been arrested for a drug violation. He knew this sitter was living with a male friend, and when asked if this was a good relationship for exposure to his children, responded he "felt it was healthy."

There was testimony that the children were frequently dirty and ill-kempt. Shannon developed a speech defect, wets the bed, and for a time purposely injured himself. Shawna demanded unusual attention. Both children swore and used four-letter words until corrected by their grandparents. When they arrive at the intervenors' home they are unusually hungry compared with other children of the same age. Shannon hides food around the house. They discuss the use of drugs in their home and the location of their father's supply.

At time of trial the intervening grandparents had been married nineteen years. Roger had just become forty years of age, Delores was thirty-nine. Both had a history of stability and hard work. Roger is employed by John Deere at Ottumwa earning $26,400 per year. He is a part-time

marshal at Ollie, Iowa, where he and Delores live. He earns $100 per month in this position, which takes about one hour per week. He has high blood pressure but it is controlled by medication.

Delores worked at Amana Refrigeration for thirteen years and at the Keokuk County sheriff's office as a radio dispatcher. She quit at the end of June 1979 to care for the children when the parties to this dissolution separated. She and Roger have cared for the children on alternate weekends since their births, and at other times.

These grandparents have a ranch-style modern home on a large lot in Ollie, Iowa. Each child has a bedroom and there are neighborhood children to play with. Roger and Delores evidence a strong love for the children, which is reciprocated, and a concern and plans for their education, training and well-being. A family counselor and therapist with a master's degree in social work, employed by the Mental Health Center at Ottumwa, found Roger and Delores to be warm, mature individuals who have grown from their prior difficulties with their daughter. He opined they would provide a stable environment for the children to grow up in and that their home would be a proper home for the children.

Terry points out the grandparents did not make a success of rearing their daughter, his former wife. They concede they were too strict and have learned a lesson from that experience. He argues visits to his home by social workers resulted in no specific findings of an inadequate home. The evidence, however, discloses these visits were by appointment. Terry testified he turned his behavior around about December 1980 and relies on trial court's finding he was not "unfit [as a parent] at this time." We agree with the court of appeals that "trial court was overly generous" in its conclusion, and we remain similarly unconvinced that these changes are permanent in

nature, and not merely motivated by the proximity of trial.

II. Terry relies on a court-ordered investigation by psychiatrist Dr. Richard L. Jenkins, who interviewed Terry, Vicki, the children, Roger, Delores and Shirley. This written report was offered into evidence by Terry and objected to by intervenors who argued it was ordered over the objection of counsel, that they had no opportunity to cross-examine Dr. Jenkins, and that the report was hearsay. Trial court's decision discloses he considered the report. Apparently, however, he was not sufficiently influenced by it to award custody to Terry.

■ We agree with the intervenors who assert their hearsay objection to the report should have been sustained and that the report should not have been considered at any stage of the proceeding. Obviously, it was hearsay.[2] *In re Marriage of Williams,* 303 N.W.2d 160, 163 (Iowa 1981); *In re Marriage of Joens,* 284 N.W.2d 326, 329 (Iowa 1979); *In re Delaney,* 185 N.W.2d 726, 730 (Iowa 1971). Terry does not suggest what exception to the hearsay rule, if any, would apply. Dr. Jenkins' report is not admissible under Iowa Code section 232.96(6) because this is not a child in need of assistance proceeding. *See In re Long,* 313 N.W.2d 473, 477–80 (Iowa 1981). It does not fall under Iowa Code section 598A.19, applicable to uniform child custody proceedings, nor under Iowa Code section 622.28, the business record exception. *See In re Mann,* 293 N.W.2d at 190. We do not consider the substance of the report on this further review.

■ We hold the best interests of Shawna and Shannon will be served by affirming the award of their custody to their grandparents, Roger and Delores Cavin. The presumption of suitability of the father, Terry, for custody of these children has been rebutted. *Corbin,* 320 N.W.2d at 545.

2. The Iowa Rules of Evidence submitted to the legislature by the Supreme Court of Iowa on January 28, 1983, do not become effective until July 1, 1983. Thus we have no reason to determine whether this report would be admissible

under rule 803(8)(c) (hearsay exception). See, however, 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 803(8) [02], at 803–196 to –199 (1981) ("by law" language in federal rule 803(8)(c) appears to refer to statutory law).

We affirm the decisions of the trial court and the court of appeals.

DECISIONS OF COURT OF APPEALS AND DISTRICT COURT AFFIRMED.