In re the MARRIAGE OF Gary B. HUNNELL and Wilma J. Hunnell.

Upon the Petition of Gary B. Hunnell, Appellant,

and Concerning Wilma J. Hunnell, Respondent,

Barbara and Robert Dawson, Intervenors-Appellees.

No. 86–571.

Supreme Court of Iowa.

Jan. 14, 1987.

Thomas P. Lenihan of Reed & Lenihan, Des Moines, for appellant.

Robert C. Oberbillig, Des Moines, for intervenors-appellees.

Considered by REYNOLDSON, C.J., and HARRIS, WOLLE, LAVORATO and NEUMAN, JJ.

WOLLE, Justice.

This appeal concerns the custody of two minor children, Anna Hunnell born on May

1, 1974, and Jessica Hunnell born on September 13, 1977. When the trial court in chambers asked eleven year old Anna what she thought this case was all about, she candidly answered, "About my mom and my dad and my aunt fighting, trying to get custody." The mother, Wilma Jean Capers (Jean), had received custody in the initial dissolution decree entered in 1978, but the father, Gary Hunnell (Gary), received sole custody when the decree was modified in December of 1979. The Dawsons had been like parents to Gary and had provided most of the primary care for the two minor children following the dissolution of the Hunnells' marriage. In May of 1985 Jean asked that the decree be modified to grant her sole custody, and the Dawsons intervened, also seeking custody. Gary denied there had been a material change of circumstances and requested that Jean pay an increased amount of child support. The trial court modified the dissolution decree to create an unusual joint custody arrangement under which Jean and Gary became joint legal custodians of their daughters, while the Dawsons were given "the sole physical care and control" of the children as well as the power to make "[t]he final decision as to what is in the best interests of the children." We conclude that the Dawsons rather than the parents should be the joint legal custodians of Anna and Jessica. With that modification of the trial court's order we affirm.

The first issue we address is whether the record demonstrates a material and substantial change in circumstances sufficient to warrant modification of the provisions governing custody. Gary argues that the record does not support the trial court's modification order because the evidence shows him to be a suitable person to continue as sole custodian of the children.

█ We review the record de novo. *In re Marriage of Zabecki*, 389 N.W.2d 396, 398 (Iowa 1986); Iowa R.App.P. 4. The burden of proof is on those not having custody of children to establish by a preponderance of the evidence that conditions since a dissolution decree have so material-

ly and substantially changed that it is in the best interests of the children to modify custody. *In re Marriage of Leyda*, 355 N.W.2d 862, 865 (Iowa 1984); *In re Marriage of Nesset*, 345 N.W.2d 107, 109 (Iowa 1984). We explained in the case of *In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983):

> The heavy burden upon a party seeking to modify custody stems from the principle that once custody of children has been fixed it should be disturbed only for the most cogent reasons.

Moreover, nonparents may be granted custody if both parents are unfit custodians or if the only parent who contests the issue with a nonparent is unsuitable to be custodian. *In re Marriage of Smith*, 269 N.W.2d 406, 408 (Iowa 1978); *accord In Interest of Mann*, 293 N.W.2d 185, 190 (Iowa 1980); *see In re Marriage of Reschly*, 334 N.W.2d 720, 721 (Iowa 1983) (cataloging cases awarding custody to nonparents where parents deemed unsuitable to be custodians).

█ The record establishes that there has been a substantial change of circumstances since the trial court modified the decree in December of 1979 to provide that Gary and not Jean should have custody. At that time, Anna and Jessica had been living with the Dawsons in their Runnells, Iowa home for about a year. In August of 1981, however, Gary abruptly appeared at the Dawson home and announced his intention of taking his daughters to live with him in Des Moines. Meeting resistance from the Dawsons, he removed the girls by force. Gary provided physical care for his daughters at his Des Moines residence until August of 1983 when, again without advance notice, he returned them to the Dawsons. The children resided with the Dawsons until April of 1985 when Gary suddenly reclaimed the girls following a heated argument with Barbara Dawson at a Des Moines school.

Children need "a stable and continuing environment." *In re Marriage of Carrico*, 284 N.W.2d 251, 254 (Iowa 1979). Since Gary replaced Jean as legal custodian in

December of 1979, he has denied his daughters the stability they need in their lives. He has repeatedly disrupted their home and school lives to suit his own purposes, a circumstance which cries out for modification of the once-modified dissolution decree. When given the opportunity, the Dawsons have provided the girls a secure home and stable environment for their upbringing. Recently, however, both girls, and particularly Anna, have exhibited signs of emotional disturbance which the trial court attributed to "the propensity of the father to suddenly as an act of punishment either toward the children or toward Aunt Barbara remove the children from that environment." A clinical psychologist evaluating Anna in April of 1985 described her as

a seriously disturbed youngster, desperately in need of some help. She has some of the anger, impulsive tendencies of her father and could become a serious threat to herself and others if she does not get some help.

Although the doctor encouraged Gary "to immediately pursue evaluation and treatment" for Anna, Gary procured none and was found by a child protective investigator of the Iowa Department of Human Services in September of 1985 to be denying Anna critical care.

Gary's sporadic parenting stints have been succeeded by intervals of virtual abandonment of his daughters. While he sometimes visited the Dawson home to show friends where his daughters lived, Gary has demonstrated no real fatherly care and concern for these minor children. Gary admits having provided the Dawsons with no financial support for the girls, instead pocketing for his own use the $100.00 their mother voluntarily sent each month since January of 1981 for their support.

In other cases involving the presumption preferring parental custody we have said that "parents should be encouraged in time of need to look for help in caring for their children without risking loss of custody." *Matter of Guardianship of Sams*, 256 N.W.2d 570, 573 (Iowa 1977); *accord Matter of Guardianship of Stewart*, 369 N.W.2d 820, 823 (Iowa 1985). The facts here, however, demonstrate no such special time of need and reveal periodic desertions rather than requests for assistance in caring for these children.

In the trial court Jean as petitioner and the Dawsons as intervenors requested that the decree be modified to remove Gary as the sole person with legal custody and responsibility for providing physical care. We agree with the trial court that they satisfied their burden to establish that changed circumstances warranted a change of custody.

Jean has not appealed from the trial court's modification of the decree giving Gary and her joint legal custody while giving the Dawsons the sole physical care and control of the children. Gary's appeal of that disposition of the case, however, requires us to determine what modified custodial arrangement will be in the best interests of these children. We conclude that the trial court order should be modified to provide that the Dawsons have legal custody as well as the responsibility for physical care and control of the children.

The Dawsons have overcome the presumptive preference for paternal custody by showing each parent's unsuitability for the physical care of the children. *See Reschly*, 334 N.W.2d at 721; *In re Marriage of Corbin*, 320 N.W.2d 539, 545 (Iowa 1982). The record supports the trial court's finding that both parents informed the court that "as an alternative to either one of them they wanted the aunt and uncle, Barbara and Robert, to have custody of the girls." We also give consideration to the fact that Anna and Jessica both voiced to the trial court their preference to live with the Dawsons. *See Zabecki*, 389 N.W.2d at 399–400; *Slidell v. Valentine*, 298 N.W.2d 599, 605 (Iowa 1980).

The Dawsons have been more like grandparents to these children than would ordinarily be true of a paternal aunt and uncle of their father. Because of the death of his mother during childbirth, Gary was reared by various family members and eventually became dependent upon his fa-

ther's sister, Barbara Dawson, for care and support. A parent-child relationship developed between them and when Jean married Gary, she too regarded the Dawsons as parents. The Dawsons provided them financial support throughout their marriage, and when the children were born they furnished free babysitting services as well. From the time Anna was one year old in 1975 until the dissolution of her parents' marriage in 1978, Barbara Dawson daily cared for her while Jean was at work. Within one month after the dissolution, the girls began residing full-time with the Dawsons. Throughout the seven years since the dissolution, the girls have always been welcomed into the Dawson home, despite the fact that their visits were usually unannounced and of uncertain duration. There they have become accustomed to the routine of life on the Dawson farm, weekly church attendance and weekend outings with the family.

During the 1983–84 school year the Dawsons drove the girls to Des Moines and back each day so that they could attend the school in which they had been enrolled while living with their father. Once counseling was recommended for Anna, all four of them began an evaluative program with a counselor in Des Moines. The Dawsons appear to have a genuine interest in the girls' well-being and have provided them many years of loving care and attention. It is in the children's best interest to be placed in the custody and physical care of the Dawsons, where hopefully they "will have a calmer life ... with less confusion ... as to where 'home' is." *See Smith*, 269 N.W.2d at 409.

We disagree with the trial court's grant of joint legal custody to the parents because clear and convincing evidence establishes that parental joint custody would be unreasonable and not in the best interest of these children. *See* Iowa Code § 598.41 (1985). We are satisfied from our de novo review of the evidence that the Dawsons are clearly the persons who should have physical care and control of the children while Gary and Jean are not fit and proper persons, acting independently or jointly, to

make "decisions affecting the [children's] legal status, medical care, education, extracurricular activities, and religious instruction." Iowa Code § 598.41(5).

We have already explained why Gary is not a fit and suitable legal custodian. Neither is Jean, but for quite different reasons. After releasing the girls into Gary's custody in December of 1979, Jean joined the military service and has since been stationed throughout the United States and in Germany. She is enthusiastic about her military career and is married to a noncommissioned officer in the United States Army. The evidence discloses that the Army has had a maturing influence on Jean, and she has long demonstrated her recognition of the responsibility to provide financial support for her daughters. Jean, however, really knows very little about the children's daily lives, as disclosed in the following telling testimony:

Q. How are the kids doing in school?
A. I honestly can't tell you that.

Q. How are they doing in church? A. I don't know.

Q. What activities do they do? A. I don't know.

Q. Who are their friends or neighbors? A. I don't know.

Q. What about their hobbies? A. I don't know.

Q. How about their medical needs? A. I don't know. I don't know specifics on any of that.

While "[p]arents are not to be denied custody for past indiscretions which do not demonstrate a present risk," *Mann*, 293 N.W.2d at 190, Jean's testimony evinces a demonstrated inadequate concern for her daughters and their real day-to-day needs and interests. Even though the Dawsons will be the custodians of their two daughters, both Gary and Jean will have the opportunity to maintain close contacts with their children during regular periods of visitation provided in the trial court's decree.

We therefore modify the trial court's decree, which modified the dissolution decree, by providing that Barbara and Robert

Dawson rather than Gary and Jean shall have joint legal custody of Anna and Jessica Hunnell.

Gary contends that Jean has been ordered to pay an insufficient amount of child support. The trial court addressed child support in its ruling modifying the dissolution decree and held:

The financial records filed by the parties and the testimony as to their respective financial condition convinces the Court that Gary should pay $125.00 per month for each of the two children as child support and that Wilma Capers should pay $50.00 per month for each of the children.

We affirm that determination which is equitable to the parties, provides for the best interest of the minor children and squares with the appropriate factors set forth in Iowa Code section 598.21(4).

Gary has raised two other issues which we do not address because they were not presented to the trial court and therefore are not preserved for appeal.

AFFIRMED AS MODIFIED.