In the Matter of the GUARDIANSHIP OF M.D., Ward,

Melissa Colquhoun, n/k/a Melissa Swab, Intervenor–Appellant.

No. 10–0342.

Court of Appeals of Iowa.

Feb. 23, 2011.

---

Mark D. Fisher of Nidey, Wenzel, Erdahl, Tindal & Fisher, Cedar Rapids, for appellant.

Christine Crilley of Crilley Law Office, Hiawatha, and Karen Volz of Ackley, Kopecky & Kingery, L.L.P., Cedar Rapids, for appellee Robert Colquhoun.

Michael Dennis Duke, II, Cedar Rapids, pro se father.

Leslie E. Stokke, Cedar Rapids, for minor child.

Heard by VOGEL, P.J., and DOYLE and TABOR, JJ.

TABOR, J.

In this appeal, a mother challenges the appointment of a guardian over her now twelve-year-old son. Before his divorce from the child's mother became final, the stepfather petitioned the district court to appoint him as the child's guardian. The

mother resisted, but the district court determined that the mother was not a suitable parent due to her history of substance abuse, mental health issues, and instability. Because the district court's determination is not supported by substantial evidence that the mother's past indiscretions posed a present risk to her son, we return to the strong presumption that custody should remain with the natural parent. We reverse the creation of the guardianship.

## I. Background Facts and Proceedings

Robert Colquhoun and Melissa Swab were married in July 2004 and had one daughter, E.C., who was born in February 2005. Robert filed a petition to dissolve the marriage on September 18, 2008. On August 12, 2009, the district court issued a decree dissolving the marriage. The decree noted that both Robert and Melissa had been "active and interested parents" and both had a positive relationship with E.C. The decree ordered joint legal custody and granted physical care of E.C. to Robert with visitation for Melissa.

Melissa has two other children. Her older daughter was fifteen years old at the time of the dissolution and had lived with Melissa's mother since birth. Her son, M.D., was ten years old at the time of the dissolution and had lived with Robert and Melissa during their four-year marriage. M.D.'s biological father, Michael Duke II,[1] was never married to Melissa and had not played an active role in his son's life. The dissolution decree encouraged (but did not order) Melissa to allow M.D. to spend time with his stepfather, Robert, so he could see his half-sister E.C. more often.

On May 6, 2009, while the dissolution petition was pending before the court, Robert filed a petition seeking to be appointed as guardian of his stepson, M.D. The petition alleged that M.D. had been in Robert's care "for approximately 95% of the time since December 2008." The petition further alleged that Melissa was "not in a stable mental or physical state to be the primary caregiver for the children." The petition alleged that Melissa suffered from anxiety and depression, which interfered with her ability to care for her children. The petition also quoted a January 2009 Department of Human Services (DHS) child abuse assessment that alleged M.D. found marijuana in a bowl on top of his mother's refrigerator. Melissa filed an answer, denying the assertions regarding the amount of time M.D. was spending with Robert, noting the DHS report was unfounded, and seeking to dismiss the guardianship petition.

On August 19, 2009, the district court held a hearing on the guardianship petition. Robert was represented by counsel. Melissa appeared pro se, as did M.D.'s biological father, Michael.[2] In addition to his own testimony, Robert called five witnesses on his behalf: his employer; his mother; his brother; Melissa's aunt; and M.D.'s father, Michael. The bulk of the testimony concerned Robert's parenting ability rather than Melissa's unsuitability. Several of the witnesses testified that Melissa suffered from anxiety attacks. Melissa presented her own testimony and that of her mother. Melissa asserted that Robert did not take a great interest in M.D. until the time of the dissolution. Melissa testified that Robert was manipulative and

---

1. Michael has been required to pay child support for M.D. since being adjudicated as his father in 2000. The record does not reveal a formal decree awarding Michael visitation with M.D.

2. On July 31, 2009, in the context of this guardianship matter, Michael filed a pro se document seeking "legal custody" of M.D.

"stalked her constantly."[3] She also testified that it was a "possibility" that she would move with M.D. to Wisconsin where her family lived to avoid Robert's stalking behavior.

Shortly after the August 2009 hearing, Melissa moved to her parent's home in Wisconsin and enrolled M.D. in school there. On September 14, 2009, Melissa obtained a protective order from the Wisconsin circuit court, after Robert left a handwritten letter in her parents' mailbox. After a hearing where Melissa and Robert both testified, the Wisconsin court found "grounds for harassment" and ordered Robert to have no contact with Melissa and M.D., unless authorized in the Iowa guardianship case. On September 16, 2009, Robert filed a notice with the Iowa court that Melissa had moved to Wisconsin and asked that this post-hearing information be considered in the guardianship determination. Based upon Robert's notice, the district court set an additional hearing for October 14, 2009. Robert, Melissa, and Michael testified at that proceeding.

On December 1, 2009, Melissa—through counsel—asked to reopen the record because she was unrepresented at the guardianship hearings and was not allowed to offer certain exhibits into the record. On December 11, 2009, the court denied Melissa's request, stating: "The mother was granted leeway in representing herself and was allowed to put a number of exhibits into evidence." The district court noted that neither Michael nor Robert had seen M.D. for three months and concluded that further delay of the proceedings was not in the best interests of the child.

On February 22, 2010, the district court appointed Robert to be M.D.'s guardian. The order stated:

This Court has no trouble concluding by clear and convincing evidence that Robert has shown that Melissa is unfit to serve as [M.D.'s] full-time parent. The record before this Court and Melissa's conduct before this Court show that she has not dealt with her long history of mental illness, substance abuse and dishonesty to the point where she should be allowed to be the caregiver of any child.

The district court provided Melissa visitation with her son concurrently with E.C., every other weekend, but no midweek visits. The court provided Michael with visitation on opposite weekends from Melissa, plus twice monthly midweek visitations.[4]

Melissa appeals.

## II. Joinder on Appeal

■ Before reaching the merits of Melissa's challenge to the guardianship, we take this opportunity to address the request by M.D.'s biological father to join Melissa's appeal. On December 23, 2010, Michael, through counsel, filed a "Request for Joinder" seeking "to join with the Appellant in her appeal and adopt[ ] the Appellant's brief as his own." The filing states:

The father of the Ward does not believe the guardianship is necessary, nor will it be in the best interest of the minor child. Furthermore, the father of the Ward believes that he and the Appellant

---

3. Melissa wrote in a letter to Michael that Robert sometimes called her "30—40—60 times a day." The dissolution decree found: "It is quite clear that Robert is very controlling as to Melissa and that his telephone calls to Melissa were excessive at times."

4. On September 2, 2010, our supreme court issued an order concluding that the district court retained jurisdiction in this case to determine the details of the parties' visitation schedules under changing conditions while the guardianship case remained on appeal.

are more capable than Mr. Colquhoun to make decisions on behalf of their son.

Michael's request does not cite any rule, statute, or case law authorizing such joinder.

In the district court proceedings, Michael appeared pro se and filed a statement on July 31, 2009, requesting that legal custody be given to him rather than Robert "in the event that Melissa Colquhoun loses custody." Michael then testified at the guardianship hearing that if his son was not able to be with him, he would "prefer he go with Bobby because ... Bobby can provide a safer environment for my son right now." The guardianship order concluded that placing M.D. with Michael would not be in the child's best interests. Michael did not file an appeal from the guardianship order.

The question presented by Michael's joinder request is whether a parent who has not appealed from a guardianship ruling may nevertheless adopt the brief of a party who has appealed. Our analysis is informed by two cases involving joinder on appeal, each in the context of appeals from the termination of parental rights. In *In re D.G.*, 704 N.W.2d 454 (Iowa Ct.App. 2005), the mother filed a timely notice of appeal, but rather than filing a petition on appeal outlining her arguments, she sought to join the father's petition. The court's decision allowing the mother to join a portion of the father's petition acknowledged that then Iowa Rule of Appellate Procedure 6.14(10)[5] allowed multiple appellants or appellees to join in one brief or to "adopt by reference any part of the brief of another." *D.G.*, 704 N.W.2d at 457. We interpreted the rule as allowing joinder only when "the interests of the joining parties, as advanced on appeal,

[are] the same," as evidenced by a "common question of fact or law." *Id.*

Our court reasoned that joinder is allowed when a party to the appeal:

> simply wants to indicate an alliance of position with another party to the appeal. A guardian ad litem, for example, may voice support for the position of a party by filing a joinder on appeal.

*Id.* at 459 n. 3.

Our supreme court also relied on then Rule 6.14(10) in deciding it could consider the arguments advanced by the county attorney in a termination appeal involving the Iowa Indian Child Welfare Act, despite the fact the county attorney was not "a proper appellant." *In re A.W.*, 741 N.W.2d 793, 804 (Iowa 2007). The court noted both the guardian ad litem and the county attorney appealed the district court's decision. *Id.* at 800. The court explained that because the guardian ad litem was a proper party to the appeal and joined in the county attorney's arguments "as a matter of convenience and efficiency"—the court could consider the arguments made in the county attorney's brief as if they had been made by the guardian ad litem. *Id.* at 804.

The significant difference between Michael and the parties who sought joinder in *D.G.* and *A.W.* is that Michael failed to file a notice of appeal. To voice one's support for the position of the appellant, it is necessary to have followed the procedural rules governing appeals. *D.G.*, 704 N.W.2d at 459 n. 3; *see also Mitilenes v. Snead*, 45 N.J.Super. 246, 132 A.2d 321, 323 (N.J.Super.Ct.App.Div.1957) (holding that a party to the district court proceedings is not allowed to adopt an appellant's brief and join in the appeal where there has not been timely filing and service of a notice of appeal). Because Michael did not

---

**5.** This rule did not survive the overhaul of the    appellate rules effective January 1, 2009.

appeal from the guardianship ruling, we decline his request to join the appellant's brief.

As a point of clarification, we note that the guardian ad litem for the ward filed a statement on May 27, 2010, concurring with and joining in "the issues, facts, arguments and authorities advanced" in the brief filed on behalf of the appellee Robert Colquhoun in this appeal. In contrast to Michael, who wishes to join the *appellant's* position, the guardian ad litem—who appeared on the ward's behalf in the district court—did not have a burden to file a notice of appeal before adopting the position in the *appellee's* brief. The rules of appellate procedure place a duty on the appellant to perfect an appeal. Iowa Rs. App. P. 6.101(1)(*b*), 6.109(1). The appellant is required to file a brief or the appeal will be dismissed. *See* Iowa R.App. P. 6.1202(1). Because an appellee does not have the same obligation to perfect and prosecute the appeal, the guardian ad litem is permitted to join the appellee's brief without taking further action. *See* Iowa R.App. P. 6.109(4) (stating guardians ad litem of record in the district court will be deemed to hold the same position in the appellate court unless another guardian ad litem is appointed and notice is given to the parties and the clerk of the supreme court).

### III. Standard of Review

The threshold question is our standard of review. The Iowa probate code generally provides:

Actions to set aside or contest wills, for *the involuntary appointment of guardians* and conservators, and for the establishment of contested claims *shall be triable in probate as law actions,* and all other matters triable in probate shall be tried by the probate court as a proceeding in equity.

Iowa Code § 633.33 (2009) (emphasis added); *see also* Iowa Code § 633.555 (stating the opening of a guardianship "shall be tried as a law action"). "In view of the specific language of these statutes, the legislative intent to provide a trial at law [in an involuntary guardianship] is clear." *In re Guardianship of Murphy,* 397 N.W.2d 686, 688 (Iowa 1986); *In re Guardianship & Conservatorship of Wemark,* 525 N.W.2d 7, 9 (Iowa Ct.App.1994). The instant guardianship case appears to have been tried at law; the district court entertained objections from the parties and entered an order rather than decree. *See Citizens Sav. Bank v. Sac City State Bank,* 315 N.W.2d 20, 24 (Iowa 1982) (explaining "[w]here there is uncertainty, a litmus test we have applied is whether evidentiary objections were ruled on by trial court" and a "decree" is generally considered the final order of an equity court). Iowa's appellate courts review actions tried at law for correction of legal error. *Murphy,* 397 N.W.2d at 687.

Nevertheless, relying on *In re Guardianship of Knell,* 537 N.W.2d 778, 780 (Iowa 1995), both parties assert on appeal that our review is de novo. In *Knell,* our supreme court did not discuss the applicable standard of review at length, stating only:

The parties agree the petition for the appointment of a guardian for Heather, a minor child, is properly tried in equity. Therefore, our review is de novo. *In re Guardianship of Stewart,* 369 N.W.2d 820, 822 (Iowa 1985).

*Knell,* 537 N.W.2d at 780. While *Knell* involved the involuntary appointment of a guardian, the *Stewart* case cited for the *de novo* standard involved the termination of a guardianship, which is a matter to be tried in equity under section 633.33. *Stewart,* 369 N.W.2d at 821–22. Our court discussed the different standards for re-

view of the initial appointment of a guardian and the termination of a guardianship in *In re Guardianship & Conservatorship of D.D.H.*, 538 N.W.2d 881, 883 (Iowa Ct. App.1995) (decided one month before *Knell*). The *Knell* decision did not state that it was overruling *Murphy* or *D.D.H.*

In light of the conflicting precedent, we opt to follow the explicit directive of the legislature in section 633.33 and review the appointment of a guardian for errors at law. Because our review is on error, the district court's factual findings are binding on appeal if supported by substantial evidence. Iowa R.App. P. 6.904(3)(a). We will affirm if substantial evidence supports the district court's findings. *Wemark*, 525 N.W.2d at 9.

## IV. Standards for Opening Guardianships

In resolving this guardianship question, our primary consideration is the best interest of M.D. *Knell*, 537 N.W.2d at 780. Iowa law recognizes a strong presumption that a child's welfare is best served in the care and control of his or her natural parents. *Zvorak v. Beireis*, 519 N.W.2d 87, 89 (Iowa 1994). Iowa Code section 633.559 creates a presumptive preference in guardianship cases: "[T]he parents of a minor, or either of them, if qualified and suitable, shall be preferred over all others for appointment as guardian." This presumption codifies the "strong societal interest in preserving the natural parent-child relationship." *In re Guardianship of Roach*, 778 N.W.2d 212, 214 (Iowa Ct.App. 2009).

But the presumption is rebuttable. *Id.* As the non-parent, Robert bears the burden to overcome the parental preference. *See Knell*, 537 N.W.2d at 781. Robert must prove the need for the appointment of a guardian by clear and convincing evidence. Iowa Code § 633.551(1). The bur-

den requires proof that the natural parent is not a qualified or suitable caregiver. *Northland v. Starr*, 581 N.W.2d 210, 213 (Iowa Ct.App.1998).

■ Our case law has long recognized that the legal right of the parents to have custody of their own children "should never be lost sight of as an influential factor," and

the court should always give the custody to them, unless they so conduct themselves, or the conditions are such, as to render it essential to the safety and welfare of the child in some serious and important respect, either physically, intellectually, or morally, that [the child] should be removed from their custody.

*Adair v. Clure*, 218 Iowa 482, 485, 255 N.W. 658, 660 (Iowa 1934).

In *Adair*, the court explained that it would not interfere with the natural right of a parent except upon a showing of " 'gross misconduct, either willful or enforced, and in character such as to threaten serious and permanent detriment to the rights and interest of the child.' " *Id.* at 661 (citation omitted). The question in *Adair* was whether the parents were entitled to custody and control of their two-year-old child, as against the fourth husband of the child's grandmother, who was "of no blood relationship whatever." *Id.* at 659. The trial court awarded custody to the step-grandfather because he and his wife had cared for the child since infancy, had greater means than the parents, and was capable of providing for the child in the future. *Id.* The Iowa Supreme Court reversed, finding that the parents were competent to bring up their own child. *Id.* at 660.

More recently, our supreme court articulated the test for overcoming the strong parental preference in guardianship cases as requiring the non-parent to show that

placement with the natural parent " 'is likely to have a seriously disrupting and disturbing effect upon the child's development.' " *Knell*, 537 N.W.2d at 782 (citation omitted). Recognition that a non-parent may provide excellent parenting to the child will "rarely be strong enough to interfere with the natural rights of the parent." *Northland*, 581 N.W.2d at 212. Our courts "have acted in some cases to remove children from conscientious, well-intentioned custodians with a history of providing good care to the children and placed them with a natural parent." *Id.* at 213. " 'Courts are not free to take children from parents simply by deciding another home offers more advantages.' " *In re Mann*, 293 N.W.2d 185, 190 (Iowa 1980) (citation omitted).

## V. Analysis

### A. Substantial evidence does not support the district court's finding that Melissa was unsuitable to continue as M.D.'s custodian.

■ Melissa contends the credible evidence offered at the guardianship hearings did not support Robert's claims she was unsuitable as a parent because of her past experience with (1) substance abuse, (2) mental health issues, and (3) instability. She argues the evidence showed that she and M.D. were doing well residing in Wisconsin; M.D. was enrolled in school, enjoying participation in football; and both she and M.D. were engaged in counseling. Robert urges us to uphold his appointment as M.D.'s guardian, arguing that Melissa is an unfit parent for a host of reasons.

Both Robert and the district court focus on Melissa's history of substance abuse and mental health problems. While these considerations are certainly relevant to the ability to be a reliable parent, neither Robert nor the district court identify clear examples of how Melissa's history is cur-

rently manifesting itself as a danger to M.D. For instance, Robert notes that Melissa was hospitalized as a result of drug consumption without clarifying that the event was in 1997, more than a decade before these guardianship proceedings. The presumption favoring parental custody is not overcome by evidence of a parent's past immaturity when such indiscretions are not present risks. *Northland*, 581 N.W.2d at 213; *Mann*, 293 N.W.2d at 190.

The only evidence in the record showing Melissa may have recently engaged in drug use was an unfounded DHS report in which M.D. told a social worker that he saw what looked like marijuana in a bowl on top of the refrigerator at the residence his mother shared with a roommate. M.D. also told the DHS worker he had never seen his mother use drugs. The record lacks substantial evidence to support the district court's finding that Melissa's history of substance abuse affects her present ability to parent.

Likewise, the guardianship proceedings did not yield significant proof that Melissa's mental health was so precarious that she could not provide suitable parenting for M.D. The record does not support Robert's claim that Melissa's anxiety attacks render her unable to retain custody of her now twelve-year-old son. While testimony showed that these attacks could be temporarily debilitating for her, there is not substantial evidence that Melissa lacked a support system to care for M.D. should she face an emergency situation.

On appeal, Robert cites his own testimony that Melissa "rarely" keeps her psychiatric appointments. Robert also refers to Melissa's psychiatric records that were offered as exhibits in the dissolution case and were the subject of judicial notice in the guardianship proceedings. These rec-

ords do not support the guardianship court's conclusion that Melissa "has not dealt with her long history of mental illness." In fact, they show that Melissa has actively sought treatment over the years for her anxiety and depression. Her efforts to get help were hindered at times by the fact that Robert's health insurance did not provide coverage because her anxiety was viewed as a "pre-existing condition." At the time of the guardianship hearing, Melissa was on medication for her depression and anxiety, which stabilized her condition, and she was seeking treatment in Wisconsin to address her underlying mental health problems.

The district court's final basis for finding Melissa was "unfit to serve as [M.D.'s] full-time parent" was her instability. The court was especially troubled by her decision to move M.D. away from Cedar Rapids, "without notice to either of [his] father figures." The court found Melissa was "evasive, at best" at the first hearing about her plans to move to Wisconsin. The hearing record does not support the court's finding. Melissa was direct in testifying that it was possible she would move to Wisconsin to avoid what she perceived as "stalking" by Robert. Nothing in the dissolution decree, the guardianship proceedings, or any prior custodial arrangement with Michael prevented such a move on her part. Melissa's decision to join her parents in Wisconsin does not show her to be an unfit custodian for M.D. Iowa cases have emphasized that the presumption for parental custody is not defeated by the act of a parent seeking help from extended family in raising his or her child. *Northland*, 581 N.W.2d at 213; *see also In re Guardianship of Sams*, 256 N.W.2d 570, 573 (Iowa 1977) (holding mother should not lose custody of children because she had been through period of "marital instability").

As it turns out, Melissa was faced with unwanted contact from Robert even after she moved, prompting her to obtain a protective order from the Wisconsin courts. In the guardianship ruling, the district court criticized Melissa for associating with abusive boyfriends, but did not mention Robert's controlling, harassing behavior directed toward Melissa, which was recognized by both the Iowa dissolution court and the Wisconsin court that issued a protective order during the pendency of the guardianship proceedings.

As evidence of her instability, Robert and the district court point to Melissa's decision to accompany an abusive boyfriend to Texas. Melissa admitted that she did so, that it was not a good idea, and that she returned after three weeks. It is significant to our analysis that this event occurred in 2000, four years before Melissa married Robert. Immature conduct by Melissa at age twenty-four does not have much bearing on the determination whether she is a suitable parent today. *See Mann*, 293 N.W.2d at 190. The district court further stated that Melissa "is now associated with a man in Wisconsin who appears to be of similar vintage." Melissa testified that she was dating a man named Jason in Platteville, Wisconsin, but the only evidence in the record that he was abusive was a newspaper article noting his arrest for an alleged violent incident with his estranged wife. This evidence standing alone does not demonstrate that Melissa's current lifestyle poses a danger to M.D.

The district court did not engage in extensive fact finding in its guardianship ruling. The court's key finding that Melissa "has not dealt with her long history of mental illness, substance abuse and dishonesty" is not supported by substantial evidence in the record, and therefore is not binding on appeal.

Substantial evidence does not support the district court's conclusion that Melissa's continued care of M.D. was not in his best interests. "[O]ur society accepts children belong with their natural parents and that their best interests are served by staying with their natural parents." *Northland,* 581 N.W.2d at 213. While setting out the correct standards for establishing a guardianship, the district court did not actually hold Robert to the heavy burden of overcoming the parental presumption. Even if Robert would be the better parent to M.D., this was not an initial custody determination in a dissolution case. The scale starts out tipping toward Melissa as the natural parent. Robert's proof of Melissa's past indiscretions and bouts with substance abuse, anxiety, and depression did not overcome the strong presumption for parental custody. In trying to establish himself as M.D.'s guardian, Robert did not offer clear and convincing evidence that Melissa's continued parenting was " 'likely to have a seriously disrupting and disturbing effect upon [M.D.'s] development.' " *See Knell,* 537 N.W.2d at 782 (citation omitted). Because substantial evidence does not support the district court's findings, we reverse the creation of the guardianship.

We realize our supreme court granted Robert's request to litigate the question of visitation in the district court during the pendency of this appeal. Given our reversal of the district court's appointment of Robert as M.D.'s guardian, the issue of visitation for M.D.'s natural parents no longer requires resolution. To establish his custody and visitation rights, Michael would need to file a separate action in equity. *See* Iowa Code § 600B.40.

Because we reverse this case on Melissa's first issue, we do not need to address her due process claim. *See State ex rel. Parcel v. St. John,* 308 N.W.2d 8, 11 (Iowa 1981).

**B. Melissa is not entitled to appellate attorney fees.**

 Melissa requests appellate attorney fees. She cites no provision in the probate code that would allow us to order Robert to pay all or a portion of her attorney fees. *See, e.g.,* Iowa Code §§ 633.200 (allowing court to fix compensation for fiduciaries and their attorneys), 633.673 (charging guardian's costs, including fees of guardian's attorney, to ward or ward's estate). The general rule—subject to an exception for circumstances in which a losing party has acted in bad faith, wantonly, or for oppressive reasons—is that a party has no claim for attorney fees in the absence of a statute or contract allowing such an award. *D.M.H. by Hefel v. Thompson,* 577 N.W.2d 643, 648 (Iowa 1998). Without evidence that Robert acted oppressively or in bad faith, we decline Melissa's request.

**REVERSED.**