In re the MARRIAGE OF Connie M. WOLF and Eugene T. Wolf.

Upon the Petition of Connie M. Wolf, Appellant,

And Concerning Eugene T. Wolf, Appellee.

No. 92–1761.

Supreme Court of Iowa.

Dec. 22, 1993.

Steven R. Bakke of Bakke Law Office, Forest City, for appellant.

William Hoekstra of Legal Services Corp. of Iowa, Mason City, for appellee.

Considered by McGIVERIN, C.J., and LARSON, CARTER, SNELL, and TERNUS, JJ.

LARSON, Justice.

In a decree dissolving the marriage of Connie Wolf and Eugene Wolf, the district court awarded custody of the parties' minor son, Jacob, to his half sister, Lisa. The court of appeals affirmed, and we granted further review. We affirm the court of appeals and the district court. Jacob's custody is the only issue on appeal.

Jacob, born July 16, 1983, was nine years old at the time of trial. He had repeated kindergarten twice because of his immaturity. In second grade, it was determined that he not only had a learning disability but a behavioral disability as well. In 1991, he attempted suicide and was placed in a psychiatric ward for adolescents. On admission, he exhibited defiant behavior, depressive symptoms, irritability, and suicidal behavior.

The court examined the background of both the father and mother for the purpose of determining who would be best able to deal with Jacob's needs. The court concluded that neither parent was suitable and granted custody to Lisa on the ground that it was in Jacob's best interests. Jacob's father, Eugene, does not challenge the custody award. As an over-the-road trucker, he would not be able to adequately care for Jacob, he says. Eugene strenuously resists Connie's efforts to obtain custody and asks that we affirm the order granting custody to Lisa.

Connie Wolf was thirty-five at the time of trial. This was her second marriage. Tom Smith and Amy Smith, two children by a previous marriage and aged seventeen and fifteen, respectively, lived with her. Connie's "boyfriend," Duane Derr, also lived with her. (At the time of trial, Jacob was not a part of Connie's household; he was living with Lisa at the time under a temporary court order.)

Jacob has indicated that he is afraid of Tom. Because Connie's workday began at 5:30 a.m., Tom and Amy were responsible for much of Jacob's care when he lived with Connie, but there was testimony that the

influence of Tom and Amy was not healthy for Jacob.

Connie and Eugene have difficulty in dealing with each other with respect to visitation. Connie's contempt for Eugene, which she made no attempt to conceal, was having a detrimental effect on Jacob, according to the testimony.

A social worker described Connie Wolf's household as a "hard-talking, tough-guy" atmosphere. She described the family's communications as negative, with considerable screaming and crying during the interviews. Excessive profanity was readily accepted in the home and used by all of the family members, including Jacob.

Connie experienced difficulty in disciplining Jacob, as she had with her older children. She stated, "I gotta get [Jacob] mad to get him to do something." Even during the interviews with the social worker, Jacob's behavior was described as out of control, symptomatic of the high level of dysfunction found in Connie's home.

A psychological examination of Connie found her to be impulsive and prone to making poor choices, particularly in terms of relationships. She was found to be rebellious and resistant to conformity with usual social behavior. She has frequent conflicts with persons in authority, temper outbursts, and difficulty adjusting her emotional response to stress and frustration, according to the psychologist.

She tends to get involved with males who treat her badly, perhaps in part because she seems to be attracted to nonconforming persons who act out hostility. The psychologist found her to be willing to tolerate a large amount of inappropriate behavior and irresponsibility. Her older children, Tom and Amy, demonstrate some of the problems that can result from such parental discipline. They were found to be rebellious and poorly disciplined. The concern, of course, is that if Connie raises Jacob he will have the same problems.

Lisa Krause, according to home studies, presented a satisfactory home atmosphere. Lisa is married, with two children. At the time of trial, her children were approximately eight and three. Her husband, Tom, has remained steadily employed for fourteen years, and Lisa has been employed for ten years as an elementary teacher's aide for children in special education classes.

A study of the Krause home revealed that Jacob was accustomed to the home. As a member of Lisa's family, he had been a frequent visitor there for a number of years. In August of 1992, the court ordered temporary custody of Jacob be given to Lisa Krause, and he has remained with her since that time.

A social worker investigating the Krause home found a number of parental strengths, and Jacob appeared to be relaxed and comfortable. There was no yelling, fighting, or profanity used during the interview, and Jacob demonstrated no inappropriate behavior or temper tantrums at that time. This worker noticed a considerable difference between Jacob's behavior in Connie's home and the Krause home.

Although the court has authority to grant custody to nonparents, they "are not free to take children from parents simply by deciding another home offers more advantages." *In re Burney,* 259 N.W.2d 322, 324 (Iowa 1977). *Accord In re Mann,* 293 N.W.2d 185, 190 (Iowa 1980).

While our cases express reluctance to award custody to parties other than parents, they have indicated a willingness to do so if the parents are clearly unsuitable. *See In re Marriage of Hunnell,* 398 N.W.2d 877, 878 (Iowa 1987); *In re Marriage of Reschly,* 334 N.W.2d 720, 721 (Iowa 1983); *Mann,* 293 N.W.2d at 190.

■ The paramount consideration in any custody dispute is the best interest of the child. Iowa R.App.P. 14(f)(15). The relevant factors to be considered have been set out in *In re Marriage of Winter,* 223 N.W.2d 165, 166–67 (Iowa 1974). The factors relevant here include (1) the characteristics of each child, (2) the specific needs of the child, (3) the suitability of each parent, (4) the capacity and interest of each parent in providing for the needs of the child, (5) the interpersonal relationship between the child and each parent, (6) the interpersonal rela-

tionship between the child and its siblings, (7) the effect on the child of continuing or disrupting an existing custodial status, (8) the nature of each proposed environment, and (9) the recommendations of independent investigators.

The detailed findings and conclusions of the district court dealt with each of these matters and concluded that the best interest of Jacob requires that he remain in the custody of his half sister, Lisa. On our de novo review, we agree. The seventh factor set out above, the effect of continuing or disrupting an existing custodial status, is especially persuasive here. Jacob appears to be well adjusted in Lisa's home, and he has been there well over a year. We believe that his best interests are served by leaving him in the custody of Lisa. Accordingly, we affirm the court of appeals and the district court.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**