# IN THE COURT OF APPEALS OF IOWA

No. 17-1481
Filed November 7, 2018

IN RE THE MATTER OF THE GUARDIANSHIP OF M.I.D.,
Minor Child,

**KOREY ISAAC DAVIS,**
        Petitioner-Appellant,

**v.**

**BRYON OINES and PAMELA OINES,**
        Respondents-Appellees.
_____

Appeal from the Iowa District Court for Woodbury County, Jeffrey A. Neary, Judge.

A father appeals the denial of his petition to terminate a guardianship of his minor child. **AFFIRMED.**

Tara S. Vonnahme of Vonnahme Law PC, Sioux City, until withdrawal, and then Anglea H. Kayl, Sioux City, for appellant..

Lindsey Buchheit of Buchheit Law, PLC, Sergeant Bluff, for appellees.

Jessica R. Noll of Deck Law, PLC, Sioux City, guardian ad litem for minor child.

Considered by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**MULLINS, Judge.**

A father, Korey, appeals the denial of his petition to terminate a guardianship of his minor child, M.I.D. Korey contends he has the fundamental right to parent his child, there is a statutory parental preference for a child's placement, and the court erred in denying this preference when there has been no showing that he is unfit to parent. Korey further contends the court erred in giving weight to the guardian ad litem (GAL) and counselor's evidence.

## I.     Background Facts and Proceedings

Korey and Molly are the parents of M.I.D., born in fall 2009. They were married shortly after M.I.D.'s birth, but the marriage was dissolved in May 2010.[1] Pamela and Bryon Oines are Korey's mother and step-father.[2] Korey lived in Texas with his biological father until early 2009, when Korey and Molly moved to Iowa to live with the Oineses before the birth of M.I.D. They moved because they believed Iowa would be a better environment in which to raise the child. They were living with the Oineses when M.I.D. was born, and M.I.D. has lived with the Oineses continuously since birth. The Oineses have been M.I.D.'s primary caretakers since Korey and Molly's dissolution. When M.I.D. was approximately nine months old and Korey was out of the state for military basic training, Molly moved back to Texas and left M.I.D. with the Oineses.[3] After basic training, Korey moved back in with the Oineses for a short time. From 2010 to 2014, Korey moved several times and lived in a number of residences in the Sioux City area. He also held a number

---

[1] Korey and Molly's dissolution decree awarded them joint legal custody of M.I.D, granted Korey physical care, and allowed Molly visitation. No child support was ordered.
[2] Pamela and Bryon were married in 2002.
[3] Molly continues to reside in Texas.

of different jobs, not remaining at any of the jobs or residences for very long. M.I.D. remained in the care of the Oineses during this time and contact with Korey was minimal.

In January 2014, Korey moved to Texas. He remains there with his wife and two children,[4] while M.I.D. remained with the Oineses. Less than a month later, the Oineses filed a petition for guardianship of M.I.D. They cited Korey's recent move to Texas, his minimal contact with M.I.D. before moving, and his lack of financial support as the reasons why a guardianship was necessary.[5] They further applied for the appointment of a GAL, pursuant to Iowa Code section 633.561(1)(b) (2014). The following day, the court granted the Oineses' request for a temporary injunction to prohibit either Korey or Molly from removing M.I.D. from their care.[6] The court also appointed an attorney as GAL.

In March, the Oineses, Korey, and Molly filed a joint stipulation in which all parties agreed that a guardianship was necessary, the Oineses were the most appropriate guardians, a limited guardianship was not appropriate, and child support would not be ordered. The court accepted the stipulation, appointed the Oineses as guardians, terminated the temporary injunction, and provided Korey and Molly with visitation "at all reasonable times and places, as agreed upon between the parties. . . . Korey and Molly will be given reasonable phone and

---

[4] Korey also has a fourth child, born sometime after M.I.D., who Korey has never met.
[5] They also cited Molly's move to Texas when M.I.D. was nine months old, her absence from M.I.D.'s life, and her lack of financial support of the child.
[6] The Oineses cited their fear that Korey or Molly would remove M.I.D. from their care because, during Korey and Molly's dissolution proceedings, Molly drove from Texas and removed M.I.D. from the state which resulted in legal action to return the child to Iowa. Further, prior to moving, Korey was reluctant to agree to give the Oineses the legal ability to care for the child.

social media contact with M.I.D. Korey and Molly shall initiate any visitation or contact." The court did not order child support. The Oineses filed guardian reports on May 31, 2014; April 21, 2015; April 1, 2016; and April 25, 2017. They noted in the 2016 and 2017 reports that M.I.D. was attending "therapy as suggested." The court accepted each of the annual reports and ordered the guardianship to continue.

On June 14, 2016, Korey filed his petition to terminate the guardianship, claiming the circumstances which warranted the guardianship no longer existed, he was able and willing to care for M.I.D., and the court did not previously find him unfit. The Oineses resisted the petition and Korey's asserted reasons for terminating the guardianship. The court continued the originally scheduled trial until Korey served the petition on the GAL and Molly, necessary parties, which occurred on October 24, 2016 and January 19, 2017, respectively.

During the trial, the court heard from Korey, Molly, Pamela, Bryon, and Dr. Raul Sanchez, M.I.D.'s therapist for approximately two years.[7] The GAL participated during the trial and, with the court's permission, filed her written closing argument a week later in which she recommended the guardianship remain in place. Korey filed a motion to strike her argument, contending that the GAL was appointed under Iowa Code section 633.561(1)(b) and arguing this section only allowed the appointment of an attorney for a proposed ward in proceedings for the appointment of a guardian, not a GAL. Further, he argued that her appointment under section 633.561 expired in 2014, at the time the court appointed the Oineses

---

[7] The court also heard from Korey's father, Pamela's sister, Bryon's daughters, M.I.D.'s soccer coach, M.I.D.'s babysitter for six years, and the Oineses' neighbor.

as guardians. Finally, he argued no request was made for the appointment of a GAL in the present termination proceedings and the court did not issue an order appointing a GAL in the proceedings. The court denied the motion, finding the GAL's initial appointment was proper and no party had objected to her appointment, the characterization of her appointment, or her participation in the hearing, and therefore Korey waived his right to contest the GAL's appointment or her involvement in the proceedings.

The court found Korey deliberately chose to not make M.I.D. a priority and relied on the Oineses to provide for and parent the child. The court also found the guardianship was not established as a temporary solution or in response to a time of need and the Oineses had taken on the parenting role for M.I.D. even before the guardianship. Based upon these findings, the court concluded Korey lost his parental preference and, consequently, the court viewed the petition in light of the best interests of M.I.D. The court denied Korey's petition to terminate the guardianship, determining the continuation of the guardianship is in the child's best interests. Korey appeals.

## II.     Standard of Review

The parties disagree as to the applicable standard of review. The standard of review for the initial appointment of a guardian is for errors at law. Iowa Code § 633.33; *In re Guardianship & Conservatorship of D.D.H.*, 538 N.W.2d 881, 883 (Iowa Ct. App. 1995). However, for proceedings involving a termination of a guardianship, review is de novo. *In re Guardianship of B.J.P.*, 613 N.W.2d 670, 672 (Iowa 2000). The determination of whether a guardianship should be terminated must "be supported by clear and convincing evidence." Iowa Code

§ 633.551(1). "We give weight to the findings of the trial court, especially when considering the credibility of witnesses, but are not bound by them." *In re Guardianship of Knell*, 537 N.W.2d 778, 780 (Iowa 1995).

### III.    Analysis

In child-custody matters, the primary consideration is the best interests of the child. *In re Guardianship of Roach*, 778 N.W.2d 212, 214 (Iowa Ct. App. 2009). "In determining the child's best interest, we must take into account the strong societal interest in preserving the natural parent-child relationship. Also, the court must consider the long-range interest as well as the immediate interest of the child." *Knell*, 537 N.W.2d at 781. "In considering the best interests of the children, the law raises a strong presumption that the children's welfare will be best served in the care and control of the natural parents." *Stanley v. Aiken*, No. 09-0723, 2010 WL 2602172, at *4 (Iowa Ct. App. June 30, 2010).

"Iowa Code section 633.559 creates a presumptive preference of parental custody." *Roach*, 778 N.W.2d at 214.[8] However, this preference is rebuttable. *Id.* A natural parent is not entitled to the statutory parental preference if there was a prior custody determination which involved a full evidentiary hearing and the court found the preference was overcome. *In re Guardianship of Stewart*, 369 N.W.2d 820, 823–24 (Iowa 1985). The presumption can be overcome by "proof that the natural parent is not a qualified or suitable caregiver." *In re Guardianship of M.D.*, 797 N.W.2d 121, 127 (Iowa Ct. App. 2011). Further, if placement with the natural

---

[8] Iowa Code section 633.559 provides, in part, "the parents of a minor child, or either of them, if qualified and suitable, shall be preferred over all others for appointment as guardian."

parent is "likely to have a seriously disrupting and disturbing effect upon the child's development, this fact must prevail." *Knell*, 537 N.W.2d at 782. Finally, natural parents "who ha[ve] taken an extended holiday from the responsibilities of parenthood may not take advantage of the parental preference for custody." *Stewart*, 369 N.W.2d at 823 (citation omitted).

Here, the guardianship was established by consent and the court did not previously examine Korey's parenting and deem him unfit, therefore Korey retained the statutory parental presumption. *See id.* Thus, the Oineses "bear[] the burden of proof of rebutting the presumption favoring [Korey] by establishing that [M.I.D.]'s best interest requires that [the child] continue in [their] care." *Knell*, 537 N.W.2d at 781. Korey argues the reason for guardianship is no longer present as he now has a stable job,[9] house, and family. Further, he argues his parental preference was not overcome because he did not take a vacation from his parental responsibilities. He contends the guardianship was established at a transitional point in his life and that once he was settled in Texas, he informed Pamela and Bryon that he was ready to take over M.I.D.'s care. He also argues he worked and accomplished the list of tasks set out in a letter from Bryon in order for the Oineses to approve transferring M.I.D. to Korey's care.

In 2015, the Oineses secured the services of Dr. Sanchez to assist M.I.D. with anxiety and separation issues, about which both Dr. Sanchez and Pamela testified. M.I.D. initially saw Dr. Sanchez weekly and currently sees him once a month. Dr. Sanchez testified that, based on his therapy sessions with M.I.D. and

---

[9] Korey testified that he currently works as a carpenter and job-site foreman for his father-in-law's contracting business in Texas. He has worked in the same job for over two years.

with M.I.D.'s issues, a sudden move, such as the one Korey requested from the court, would be traumatic. While Korey asserts the trial court gave too much weight to the opinion of Dr. Sanchez, we "give opinion testimony the weight we consider it deserves after considering, among other things, the expert's education, experience, familiarity with [the] case, reasons given for the opinion, and interest, if any, in the case." *In re Marriage of Rosenfeld*, 524 N.W.2d 212, 215 (Iowa Ct. App. 1994). While we recognize that Dr. Sanchez has never met or communicated with Korey, we do not find that no weight should be given to the doctor's testimony. The trial court was faced with the difficult question regarding M.I.D.'s best interests. Dr. Sanchez has worked with M.I.D. for two years and provided relevant information about M.I.D. and the doctor's understanding of the situation M.I.D. is currently in and would potentially face if the guardianship was terminated. The trial court's ruling did not stress or heavily rely on Dr. Sanchez's opinion. We, like the trial court, use his testimony as merely one factor to consider in our determination whether the guardianship should continue.

As to Korey's complaints about the participation of the GAL, after the close of the evidence and the GAL's submission of her written arguments, Korey filed a written motion to strike the closing argument. The district court ruled he had waived any objection by failing to object until that time. On appeal, Korey expands the scope of his argument, also challenging the performance of the GAL. First, we note that appointment of counsel in a proceeding for the appointment of a guardian is governed by Iowa Code section 633.561, with subsection (1)(b) applicable to such an appointment for a minor. Korey's opposition to the GAL's involvement in this case is focused on the termination of guardianship proceedings, not the

appointment of the guardians. As such, section 633.561(1) is not applicable. Section 633.561(6) (2016) provides: "If the court determines that it would be in the ward's best interest to have legal representation with respect to any proceedings in a guardianship, the court may appoint an attorney to represent the ward." In the present case, the court did not make such a determination.

But, Iowa Rule of Civil Procedure 1.212 governs the appointment of a GAL in a guardianship case, requiring the appointment of a GAL "if a party served with original notice appears to be subject to rule 1.211." Rule 1.211 provides "no judgment . . . shall be entered against a party then a minor." *Estate of Leonard ex rel. Palmer v. Swift* describes the role and responsibilities of a GAL in greater detail. 656 N.W.2d 132, 139–41 (Iowa 2003). There is an "overlapping nature" of the responsibilities of a GAL and an appointed attorney, however, each serve different functions. *Id.* at 141–42. The GAL serves and advises the court, "advocat[ing] for the best interests of the ward, whereas an attorney advances the wishes of the ward." *Id.* at 142. "In other words, because of the fundamental distinction between their roles, the appointment of a guardian ad litem is not the same as appointing an attorney." *In re Guardianship of Griesinger*, 804 N.W.2d 527, 529 (Iowa Ct. App. 2011).

We agree that in the termination proceedings, the court should have entered an order appointing the GAL prior to her service. However, the record is clear from the beginning of the case—when the court ordered Korey to serve the petition on the GAL—the court intended the GAL who had earlier served at the time of appointment of the guardians to now provide service in this termination proceeding. The court correctly overruled Korey's motion to strike, but we find on

our de novo review that even disregarding the GAL's written closing argument, we are persuaded the evidence supports the district court's conclusion.

First, we do not find that this is a case where a parent sought help in caring for their child in a time of need and temporarily placed their child in another's home while maintaining contact with the child and only providing whatever support they could. *See Knell*, 537 N.W.2d at 782. Korey did not seek out the establishment of the guardianship. Instead, Korey left the state without setting up arrangements for Pamela and Bryon to have the legal right to care and make decisions for M.I.D. The Oineses sought the guardianship in order to obtain those rights. Korey then stipulated to the guardianship. Further, Korey conceded that the Oineses have basically been M.I.D's primary caretaker since birth. M.I.D. only lived with Korey when Korey resided with Pamela and Bryon. During the time from 2010 to 2014 when Korey was living in multiple residences in the Sioux City area, M.I.D. resided with the Oineses and his contact with M.I.D. was minimal.

Further, there continues to be a lack of a relationship between Korey and M.I.D. Since moving to Texas, Korey has only seen M.I.D. in person twice, one of which was just days before the guardianship hearing. He cites finances and the distance between Iowa and Texas as inhibiting his ability to see M.I.D. more often. However, we note the lack of effort on Korey's part to attempt to change this, such as meeting the Oineses in a location somewhere in between Iowa and Texas. On the occasion Korey was in the area to visit M.I.D. in 2015, he left early in order to socialize with friends in Omaha. While the evidence shows Korey did attempt to call M.I.D. more often, it was only in the month prior to the hearing. Even before the establishment of the guardianship when Korey still lived in Iowa, visitation with

M.I.D. was sporadic. We do not find in the record any alternative means Korey has consistently utilized to remain in contact, such as letters or sending pictures. Korey admitted he has only sent a couple letters during the entire guardianship and has never sent pictures, though Korey's wife, Kaitee, did share some photographs of the family with Pamela through Facebook. We do recognize and give weight to the district court's assessment that the Oineses may not be as supportive of Korey's visits or contact with M.I.D. as they could be, but also recognize the court's further assessment that the Oineses had reason to be cautious and hesitant given Korey's track record. In total, we find that Korey has taken an "extended holiday from the responsibilities of parenthood" and placed the task and responsibilities of parenting M.I.D. on the Oineses since birth. *Stewart*, 369 N.W.2d at 823 (citation omitted). We find little evidence of Korey actually parenting M.I.D. Therefore, we agree with the district court that Korey "may not take advantage of the parental preference for custody." *Id.* Thus, we look to "the welfare and best interests of the child." *In re Guardianship of Ankeney*, 360 N.W.2d 733, 736 (Iowa 1985).

Korey asked the court to just allow him to take M.I.D. home to Texas after the hearing. M.I.D. has never met Kaitee, and there is nothing in the record which shows M.I.D. has ever spoken to Kaitee on the phone or through other mediums. Despite being a stranger to M.I.D., Korey testified that Kaitee would essentially be M.I.D.'s primary caregiver, including transporting M.I.D. to and from school and caring for the child after school. Further, Korey would also be leaving Kaitee in charge of M.I.D.'s education, as he did not know the name of the school M.I.D. would attend or even the length of a school day. He conceded Kaitee is more

familiar with that issue. Korey's lack of attention to M.I.D.'s education planning is consistent with the fact he has left all the responsibility of M.I.D.'s education to the Oineses and has little knowledge of M.I.D's current school or school-related activities. He testified he does not know the name of the school and has not been in contact with any school officials to inquire about M.I.D.'s progress.

There was also no testimony or evidence as to what preparations are in place to deal with M.I.D.'s psychological adjustment. Korey's assertion that he was not told that M.I.D. was in therapy until just before the hearing is disingenuous, as the guardianship reports filed in 2016 and 2017 clearly indicate that M.I.D. was in "therapy as suggested." Korey did not seem aware of what issues M.I.D. had or was working on in therapy. There was no evidence that Korey inquired about M.I.D.'s therapy or contacted the therapist to learn about it, considered steps he himself could take to assist M.I.D., or to try to become a part of M.I.D.'s therapy. While Korey testified that he would agree to the therapist's recommendations on transitioning M.I.D. to his care, there was no testimony about what therapy options or providers are available to M.I.D. in Texas or how to transition M.I.D.'s therapy to a new provider.

Korey also testified M.I.D. would be expected to sleep in the same room as one of his other children in bunk beds. There was no evidence that M.I.D. has ever met or even communicated with Korey's other children or if the other children were aware of M.I.D.'s existence. Korey further admitted he cannot afford health insurance on any of his children so M.I.D. would not be insured in Korey's care. Moreover, Korey did not know the name of his children's current doctor or who

M.I.D. would see for medical care. In total, Korey has simply "not demonstrated a knowledge or concern for [M.I.D.]'s nonfinancial needs." *Knell*, 537 N.W.2d at 782.

As to M.I.D.'s financial needs, Korey has not provided any financial support for M.I.D's care throughout the guardianship. Even before the guardianship, Korey was serially under- or unemployed and not in a position to provide financially for M.I.D. Since Korey moved to Texas, he has obtained a good-paying job with his father-in-law. Despite this, Korey does not provide any financial support for M.I.D. We recognize that Korey is not under any court-ordered obligation and the initial stipulation creating the guardianship provided that Korey would not be required to pay child support, but there is nothing in the record of Korey offering to begin any financial support once he had a stable job.

The evidence shows that if the guardianship were terminated at this time, very little was planned or even considered to deal with M.I.D.'s adjustment to an involved father and a new home, step-mother, siblings, school or other living circumstances. On our review of the record, we find a return of M.I.D. to Korey's custody at this time "is likely to have a serious disturbing and disruptive effect on [M.I.D.]'s development" and would likely be detrimental to M.I.D's well-being. *Id.* We find it is in M.I.D.'s best interests to remain in the Oineses' care and agree with the district court that the guardianship should remain intact. We therefore affirm the district court's order denying Korey's petition to terminate the guardianship of M.I.D.

Both Korey[10] and the Oineses request appellate attorney fees. The award of appellate attorney fees is within our discretion. "We consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the trial court's decision on appeal." *In re Guardianship of G.G.*, 799 N.W.2d 549, 554 (Iowa Ct. App. 2011). Under the circumstances, we decline to award appellate attorney fees. Costs on appeal are assessed to Korey.

**AFFIRMED.**

---

[10] Korey failed to submit an affidavit support his claim for appellate attorney fees, and no request was made to allow a late filing. Pamela and Bryon did file a timely affidavit.