# IN THE COURT OF APPEALS OF IOWA

———————————

No. 25-0606
Filed May 27, 2026

———————————

**In the Matter of the Guardianship and Conservatorship of Stanley Wayne Worthington**

**Stanley Wayne Worthington,**
Appellant/Cross-Appellee,

v.

**Cynthia Goro and John Worthington,**
Appellees/Cross-Appellants.

———————————

Appeal from the Iowa District Court for Black Hawk County,
The Honorable Melissa Anderson-Seeber, Judge.

———————————

**AFFIRMED AS MODIFIED**

———————————

D. Raymond Walton and Kate B. Mitchell of Beecher, Field, Walker, Morris, Hoffman & Johnson, P.C., Waterloo, attorneys for appellant.

Anne K. Wilson of Anne K. Wilson Law Office, PLLC, Cedar Rapids, attorney for appellees.

———————————

Considered without oral argument
by Greer, P.J., Schumacher, J., and Doyle, S.J.
Opinion by Greer, P.J.

1

**GREER, Presiding Judge.**

Cynthia Goro and John Worthington,[1] with the support of their other siblings, petitioned for their appointment as co-guardians and co-conservators of their ninety-three-year-old father, the protected person.[2] After a contested hearing over two days, the district court determined that the protected person required the assistance of a conservator through a limited conservatorship and a guardian for his care. The district court appointed the petitioners as limited co-conservators and as co-guardians. The protected person appeals the ruling of the district court. Pointing to the failure to show any medical or mental-health frailty, the protected person contends that he is capable of handling his own financial affairs and can meet his medical and other needs without the help of any person. In a cross-appeal, the petitioners appeal from the district court's determination related to the limited conservatorship finding and the partial denial of their attorney fee award after the district court limited the fee to $7,500.

We find there was substantial evidence presented by the petitioners and they met their burden to show by clear and convincing evidence that the protected person requires a guardianship and a conservatorship, and we find the limited conservatorship was appropriate based on the evidence provided. Finally, we award legal fees of $11,039 to the Trent Law Firm and $1,909.50 to Anne Wilson.

---

[1] Unless referencing John or Cynthia individually, we will refer to them collectively as the "petitioners."

[2] Out of respect for this individual's privacy, we refer to him throughout this opinion as the "protected person."

## I. Background Facts and Proceedings.

Believing the protected person might revoke the June 2021 medical and financial powers of attorney that he had signed, the petitioners filed a petition to establish both a conservatorship and a guardianship. During the evidentiary hearings in this matter, several people testified, including the petitioners, the protected person, and the director of the skilled nursing assisted living facility where the protected person lives. Cynthia testified to her observations of cognitive decline in the protected person, which was most pronounced in his ability to regulate. Concerns about his eviction from an assisted living facility were also raised, given that some of the issues leading to the eviction involved inappropriate sexual comments to staff. Both petitioners also testified that the protected person's memory was starting to fail. All parties agreed that the protected person has mobility limitations and requires the use of a walker or a wheelchair.

As for the assets involved, without explanation for the "business" reasons, the protected person's ex-wife, who he continued to live with until her death in June 2024, received the majority of the couple's assets when they divorced in 1983. Those assets are held in trust and were used by the couple for their living expenses until the ex-wife passed away. Now, only the protected person benefits from the trust earnings. The petitioners are the co-trustees. The protected person also retained exclusive control over his approximately $3,000 monthly social security benefits, and he used those funds to pay other bills and make other personal purchases, such as eating out or paying for a transportation service.

Prior to his ex-wife's death, the couple lived in an independent living unit, but they received a notice of intent to terminate their occupancy because the protected person's behavior had become inappropriate and abusive to

3

staff. The notice described that the protected person's outbursts were "grow[ing] more severe, profane and disruptive." Other inappropriate behaviors were noted as well that made staff increasingly uncomfortable.

After that eviction, the couple moved into separate apartments at an assisted living community, but the protected person experienced a serious health issue requiring surgery and had to be relocated to a more intensive care placement while he recovered. In the meantime, his ex-wife passed away. As he recovered, the protected person was moved into a skilled nursing placement that he vehemently dislikes. He testified he intends to leave the current skilled nursing unit, move into an apartment, and hire his own caretakers.

The petitioners both testified that the protected person requires more medical care than he admits. Both petitioners also presented evidence about a caregiver that the protected person had used previously. This caretaker, L.A., initially worked for an agency that was retained to provide medical and other support to both the protected person and his ex-wife before her passing. Once that agency closed, the protected person continued to retain L.A., but the children did not know the details of the employment relationship. At the protected person's current residence, his care is provided by nursing staff there, thus, the petitioners could identify no reason to pay L.A. for caretaking. The children became concerned after seeing checks that were written by L.A. for her benefit, signed by the protected person and drawn from his account. Other details were troubling. The protected person allowed L.A. to use the ex-wife's car prior to her death, which upset the ex-wife. L.A. used the protected person's debit card in Illinois, spending about $1,200, although the protected person contended he did not give her the debit card or provide her with his PIN. In April 2024, John, with the

4

protected person's permission, reported this incident to the police. The police report noted that John stated, "It is hard to get the exact information as his story is slightly different each time I talk to my dad." Ultimately, the protected person did not want to press the matter further. At the hearings, John characterized L.A.'s behavior as "elder abuse."

A few months later, the children learned that the protected person and L.A. went to the credit union where on one occasion the protected person withdrew $2,317.06 from his account. Later that same month, they again came to the credit union together and withdrew $750 from his account.[3] After this withdrawal, the credit union reported the incident to the police. Although L.A. is thirty-nine years old, she and the protected person reportedly rented a hotel room on this same date and entered the room between the two trips they made to the credit union. When they returned to the credit union to withdraw more money, they were met by an investigating police officer. The officer asked L.A. if she was the "caretaker of the male" and she answered, "I am." When interviewed, the protected person told the police he needed the cash "for gas, going out to eat, and a hotel room." He also indicated that L.A. had not been paid for her services. As the hotel room statement "caught [the officer's] attention," he asked the protected person to explain his reason for renting the hotel room and the protected person said "it was for his lawyer's business partners" and "it was part of [the lawyer's] payment agreement." L.A. told police that the protected person takes her out to dinner and often fills her gas tank and that she takes him places when he calls her. The protected person admitted that he had given L.A. money on several occasions, some of which he could not specifically remember, but

---

[3] There was video evidence played at the hearings from the credit union, but these were not entered into evidence, so we do not have the benefit of viewing those videos.

that he likes to help the less fortunate. The petitioners noted that the protected person also paid for L.A.'s water bill, electrical bill, items for her children, car repairs, nail salon expenses, clothing purchases, and fireworks.

As for the protected person's financial matters, the petitioners testified and produced documents showing that often the protected person did not timely pay bills and that his account occasionally would be overdrawn. They also confirmed that the technology involved with his banking and his medical care was challenging for him, requiring their help. The district court observed that at times during his testimony the protected person appeared to lose his train of thought, although most often he was articulate and well-spoken. Plus, he testified he had $50,000 in his account when, in fact, there was only around $4,000 based upon the account records.

As for the medical-care concerns, mobility was an issue related to safety. First-hand, the skilled care director observed a safety concern where the protected person walked across a room with his trousers halfway down his legs and continued to do so even though the director instructed him it was a safety issue and to pull them up. Still, the protected person wanted to move to an independent apartment even with his mobility issues, and the petitioners testified that the protected person would not be able to prepare meals, appropriately take care of hygiene, or know when to take his eight medications.

Overall, the petitioners confirmed that the protected person was not able to navigate the digital world as it applied to his financial matters and his medical care. He had the assistance of his children to manage these matters before the petition was filed as it was clear that he could not keep his bills current and manage the medical portals and insurance systems. And, because the protected person would not cooperate, the petitioners could not

6

present any medical or neuro-psychological evaluation to assess the protected person's mental or physical status.

In the ruling, the district court found that although the trust served to meet the needs of the protected person, the protected person's decision-making capacity related to decisions impacting his health and safety required the assistance of the petitioners. The district court found that the protected person's "decision-making capacity is so impaired that both a guardianship and conservatorship is necessary." Noting its duty to consider the appropriateness of a limited guardianship or conservatorship, the district court found that based upon the evidence, a limited guardianship would not meet the protected person's needs. *See* Iowa Code § 633.551(3)–(4) (2024) (requiring that a "court *shall* consider" if a limited guardianship or conservatorship is appropriate (emphasis added)). But because the trust was involved, the court found "special circumstances" that supported a limited conservatorship. The district court then set out the powers relative to the full guardianship and limited powers related to the conservatorship. The petitioners dispute the determination that a limited conservatorship is sufficient protection and appeal from that issue. The protected person appeals the ruling in full, contending that neither restriction is warranted and that the petitioners did not meet their burden of proof.

As for the petitioners' attorney fee issue, the billings involved attorney fees incurred between the time their counsel (Anne Wilson) was a member of a law firm (Trent Law Firm) and when she opened her own firm. Bottomline, the petitioners argue that they should be awarded the full fees for legal services rendered and related expenses. In November 2024, petitioners' counsel submitted two invoices to be approved. The invoices related to fees owed for charges through November 6, 2025: one for the Trent

Law Firm in the amount of $11,039, including $30 in costs and the other invoice to Wilson for fees of $1,909.50. Still, the district court only approved fees of $7,500 and $30 for expenses.[4] The petitioners moved to reconsider the ruling.[5] In its March 27, 2025 order, the district court addressed the motion:

> The Court granted the payment of attorney fees in the amount of $7,500. The Court reviewed the submitted fees from counsel for the guardians and limited conservators. The Court found the fees to be excessive. While the Court recognizes that there were several hearings in this case, counsel for [the protected person] submitted an attorney fee claim for $7,325, plus expenses. The Court views these attorney fees to be reasonable for this case. Based on that amount, the Court approved $7,500 for payment by [the protected person] for the co-guardians and co-conservators' attorney fees. The Court does not have information about the separation agreement between the Trent Law Firm and Anne Wilson. Therefore, it is not in a position to determine whether or how the $7,500 should be divided between the two firms. Therefore, the Motion to Reconsider Payment of Attorney Fees is denied.

Next, we consider the respective appellate issues of these parties.

## II. Standards of Review.

Actions for the involuntary appointment of guardians and conservators are actions at law; thus, our review is for errors at law. *In re Conservatorship of Deremiah*, 477 N.W.2d 691, 692 (Iowa Ct. App. 1991); *see*

---

[4] We note that the record shows that $4,000 was held in trust at the Trent Law Firm to apply to the fees once the district court provided direction.

[5] In the reconsideration motion, the petitioners presented a third request for attorney fees related to fees charged by Wilson from November 2024 until March 2025. We do not consider that fee request, as it was not presented at trial or before the January 22, 2025 order setting out the fee award. Any request related to fees not considered by the court in the January 2025 order should be presented and ruled upon by separate order.

Iowa Code §§ 633.33, .551; Iowa R. App. P. 6.907. "Because our review is on error, the district court's factual findings are binding on appeal if supported by substantial evidence." *In re Guardianship of M.D.*, 797 N.W.2d 121, 127 (Iowa Ct. App. 2011); *see also* Iowa R. App. P. 6.904(3)(a) (same). "Evidence is substantial or sufficient when a reasonable mind would accept it as adequate to reach the same findings." *Deremiah*, 477 N.W.2d at 693.

An award of attorney fees is reviewed for an abuse of discretion. *See Ferguson v. Exide Techs., Inc.*, 936 N.W.2d 429, 431 (Iowa 2019).

## III. Analysis.

The protected person's main contention is that the district court erred in making its decision to appoint limited co-conservators and co-guardians because his children failed to present any medical or other evidence that he cannot understand his needs, care for himself, or handle his financial affairs. We first address the questions related to the guardianship, then the limited conservatorship. We finish with an analysis related to the petitioners' attorney fees.

**A. Was a Guardianship Properly Established?** The protected person asserts that the petitioners did not meet their burden to show by clear and convincing evidence that his decision-making capacity was so impaired he required a guardian, especially when they failed to establish any medical evidence supporting that conclusion. Clear and convincing evidence "means there must be no serious or substantial doubt about the correctness of a particular conclusion drawn from the evidence." *In re M.S.*, 889 N.W.2d 675, 679 (Iowa Ct. App. 2016). After filing their petition for guardianship and conservatorship, the petitioners had the burden to show by clear and

9

convincing evidence that the protected person was incompetent. Iowa Code § 633.551(1)–(2).

The basis for appointing a guardian is found in Iowa Code section 633.552(1)(a)–(b) and is set out as follows:

> 1. On petition and after notice and hearing, the court may appoint a guardian for an adult if the court finds by clear and convincing evidence that all of the following are true:
>
> a. The decision-making capacity of the respondent is so impaired that the respondent is unable to care for the respondent's safety, or to provide for necessities such as food, shelter, clothing, or medical care without which physical injury or illness may occur.
>
> b. The appointment of a guardian is in the best interest of the respondent.

Cynthia testified that they attempted to obtain a medical evaluation, but the protected person would not cooperate. As for that missing piece, the district court found that the testimony and the exhibits presented to the court provided sufficient information from which a decision could be made. Here, the district court had the benefit of viewing the witnesses, and the substantial evidence standard of review precludes us "from weighing the evidence or the credibility of the witnesses." *Deremiah*, 477 N.W.2d at 693 ("In case of doubt or ambiguity," we are obligated to "construe the findings to uphold, rather than defeat, the trial court's judgment.").

During the trial, the petitioners gave examples of the protected person's behavior that showed his inability to utilize technology for medical care, and his inability to make good decisions about his housing, personal safety, and medical care. The testimony and exhibits reflected a sincere concern by the protected person's children to continue their help in keeping their father healthy, well, and safe. And at the hearing, the protected person

even noted: "And I'm finding out today and the last time we met here [at the first hearing] that they've got more problems, I guess, from me than I ever knew.  But I guess they were just being kind to me."

Most concerning, the protected person wanted to move out of the skilled care unit where he was provided food, medical support, and other nursing services to an apartment that he felt he could rent for significantly less rent than the market required.  There he would have no medical help, would be unsafe given his mobility, and would have no provisions for food and transportation as he could no longer drive.  Based upon the last several months, the petitioners did not believe the protected person could reliably take his eight different medications and manage a healthy lifestyle.  Overall, the protected person did not have the decision-making capacity to understand the level of care necessary to keep him safe and healthy.

We find substantial evidence supporting the district court's guardianship decision.

**B. Was a Limited Conservatorship Appropriate?**  In its ruling, the district court set out limited powers for the co-conservators:

> Serve as a fiduciary and act in the best interest of [the protected person] and exercise reasonable care, diligence, prudence, and loyalty in performing conservatorship duties and responsibilities as set forth in Iowa Code chapter 633.  The limited co-conservators shall consult with [the protected person] on all aspects of his finances and may make arrangements for automatic pay for his bills and expenses.

> Except as otherwise limited by the court, ensure [the protected person's] health, education, safety, welfare, and support.

Our legislature set out Iowa Code provisions that offer the basis for appointment of a conservator:

> 1. On petition and after notice and hearing, the court may appoint a conservator for an adult if the court finds by clear and convincing evidence that both of the following are true:
>
> a. The decision-making capacity of the respondent is so impaired that the respondent is unable to make, communicate, or carry out important decisions concerning the respondent's financial affairs.
>
> b. The appointment of a conservator is in the best interest of the respondent.

Iowa Code § 633.553. Related to the limited conservatorship, the court may establish conservatorship powers that consider if "the protected person has a limited ability to handle the protected person's own funds. If the court makes such a finding, the court shall specify to what extent the protected person may possess and use the protected person's own funds." *Id.* § 633.637(1).

For the same reasons we find that the guardianship is appropriate, we also find a conservatorship is warranted as well. In addition to the previously discussed considerations, we find that the protected person's inability to keep track of and pay bills, maintain a positive bank balance, and navigate the technology related to the accounts are relevant factors to consider.[6] And, even before the filing of the petition, the protected person relied upon his children to take care of his financial affairs. *See In re Guardianship of Evans*, No. 16-2192, 2017 WL 4570438, at *3 (Iowa Ct. App. Oct. 11, 2017) (finding ward's inability "to make and carry out important decisions regarding her financial affairs," as demonstrated by evidence of her ignorance of her bills and payment procedures and her inability to consistently pay her rent, supported the establishment of a conservatorship). But, more importantly,

---

[6] Another witness also testified that the large donation the protected person claimed to have made to support the witness's father's honor flight was never made.

12

the evidence establishing the potential for financial elder abuse related to the protected person is further support of the protected person's impaired decision-making capability. *Id.* (finding protected person's tendency to give her debit card to other people resulting in missing funds showed her inability to make and carry out important financial decisions).

Finally, we consider the district court's determination that a limited conservatorship best respects the protected person's ability to manage some of the financial activity. We find the limitations the district court set are well taken as the protected person has access to limited funds for some sense of autonomy while still allowing for the protection of the trust assets for his overall needs. *See* Iowa Code § 633.637(1) (requiring a determination as "to what extent the protected person may possess and use [their] own funds"). Thus, the evidence supports this minimal limitation on the co-conservators' exercise of their powers. The limitations established by the court do not interfere with the co-conservators' duty to protect the assets. *See In re Rininger*, 500 N.W.2d 47, 50 (Iowa 1993) (noting the duty of a conservator to protect, preserve, and account for the protected person's assets and to invest them prudently).

Substantial evidence supported the need for a limited conservatorship.

**C. Petitioners' Award for Attorney Fees.** The petitioners do not dispute the legal fees charged by their counsel. Instead, they argue that the district court erred when it found the reasonable attorney fees could be determined through a comparative analysis—or in other words, paying their counsel the same as the protected person's counsel. The protected person points to the reasoning in *In re Guardianship of Norelius* to support the district court's award. No. 19-0210, 2020 WL 2544234, at *2 (Iowa Ct. App. Jan. 23, 2020) (finding the district court did not abuse its discretion in

determining that the fees awarded to the intervenor should not exceed those awarded to the co-guardians); *see also* Iowa Code § 633.551(5) ("[I]n proceedings to establish a guardianship or conservatorship, the costs, including attorney fees, . . . shall be assessed against the respondent or the respondent's estate . . . ."). As an alternative stance, the petitioners request that, at the very least, the court should have determined what part of the $7,500 in fees went to the previous law firm and what percentage should be paid to Wilson individually.

We provide guidance by examining if the district court abused its discretion, which "occurs when the decision is based on a ground or reason that is clearly untenable or when the court's discretion is exercised to a clearly unreasonable degree." *Anderson v. Anderson Tooling, Inc.*, 928 N.W.2d 821, 826 (Iowa 2019) (cleaned up). We consider the district court "an expert in what constitutes a reasonable attorney fee, and we afford it wide discretion in making its decision." *GreatAmerica Leasing Corp. v. Cool Comfort Air Conditioning & Refrigeration, Inc.*, 691 N.W.2d 730, 733 (Iowa 2005).

The Trent Law Firm invoice was over eight pages and detailed the work performed by Wilson while in its employ. Wilson's invoice was five pages long and, again, detailed the work performed. The district court did not set out how it calculated the fees to the petitioners' counsel or why the requested fees were not granted. It also did not address the question over how the $7,500 award should be split between the invoices submitted. On our review of the billings, the hourly rates charged by the attorney and legal assistant were not excessive and the time incurred for the work performed was reasonable. The trial lasted two days, with a four-month delay between the dates, and along with the case preparation, the work involved investigation into theft allegations against L.A. Other than the court noting

14

that $7,500 was a "reasonable" fee for the case, we are left with little guidance on what part of the charges were unreasonable or unnecessary in the presentation of this legal matter. And although a court need not "make dollar-by-dollar attorney fee reductions" or "sift through all the legal work done," on our review, we find the work performed by Wilson to be appropriate and reasonable. *Smith v. Iowa State Univ. of Sci. & Tech.*, 885 N.W.2d 620, 626–27 (Iowa 2016) (citation omitted). Yet, the district court is required to consider if there is any deduction necessary for time unrelated to the litigation, and if the fees are reasonable in light of the work performed and result obtained. *Id.* at 625. These general principles govern attorney fee awards and should have been considered here. *Id.*

We can make that call and, after reviewing the separate billings and the itemized time entries, we award the Trent Law Firm fees and costs in the amount of $11,039.00 and Wilson fees and costs in the amount of $1,909.50.

## IV. Conclusion.

We find there was substantial evidence presented by the petitioners and they met their burden to show by clear and convincing evidence that the protected person requires a guardianship and a conservatorship, and we find the limited conservatorship was appropriate based on the evidence provided. Finally, we award legal fees of $11,039 to the Trent Law Firm and $1,909.50 to Anne Wilson.

**AFFIRMED AS MODIFIED.**

15