# IN THE COURT OF APPEALS OF IOWA

———————————

No. 25-0797
Filed June 24, 2026

———————————

**In the Matter of the Guardianship and Conservatorship of Mark R. Davies,**

**Mark R. Davies,**
Appellant.

———————————

Appeal from the Iowa District Court for Polk County,
The Honorable Katie Ranes, Judge.

———————————

**AFFIRMED**

———————————

Amy K. Davis of Miller & Evans, P.L.C., Des Moines, attorney for appellant.

Samuel E. Jones, Sarah C. Barr, Weijing Wu, and Jackson C. Blais of Shuttleworth & Ingersoll, PLC, Cedar Rapids, attorneys for appellee Erin Droll, Guardian and Conservator for Protected Person.

———————————

Considered without oral argument
by Greer, P.J., and Schumacher and Chicchelly, JJ.
Opinion by Greer, P.J.

**GREER, Presiding Judge.**

After Angela Schomer petitioned to establish a guardianship and conservatorship over her father, the protected person,[1] and after a hearing, the probate court determined that a permanent guardian and conservator should be appointed. The probate court appointed Erin Droll, a professional fiduciary, to serve as the permanent guardian and conservator. The protected person now appeals and asserts the district court erred by finding there was clear and convincing evidence that he required a guardian and conservator. Further, the protected person asserts that the court abused its discretion when it questioned witnesses during the hearing. He requests that the petitions to establish the guardianship and conservatorship be dismissed.

Schomer, as the petitioner, and Droll, as the appointed guardian and conservator, are aligned in their position that they established clear and convincing evidence that the protected person's decision-making capacity was so impaired as to require both a guardian and a conservator After our review, we find substantial evidence supporting the probate court's findings and find no error. Additionally, the probate court appropriately exercised its discretion by questioning the protected person. We affirm the ruling establishing the permanent guardianship and conservatorship.

## I. Background Facts and Proceedings.

The protected person and his wife, N.D., have three adult daughters, including Schomer. Schomer has medical and financial powers of attorney for her mother, and before this litigation had been helping to take care of her parents. At the time of the hearing on the petition, N.D. had dementia and

---

[1] Out of respect for this individual's privacy, we refer to him throughout this opinion as the "protected person."

2

was living in a memory care facility, and the protected person, who was sixty-eight years old, was residing in a rehabilitation and skilled care facility after being hospitalized for an injury to his left leg. As described by Schomer at the hearing, her mother was removed from the home in June 2024 after a firefighter, conducting a wellness check, found her extremely malnourished and mostly unresponsive. Although her condition required immediate hospitalization, the protected person denied recognizing that his wife's condition was so dire. Schomer opined that the protected person "had no idea what was going on, as far as the mental capacity and the cognition of my mom. And he also . . . didn't have the means to be able to do so." According to Schomer, her mother had "been the primary caretaker of [the protected person] for multiple years, twenty plus years" and had managed the finances.

After N.D. was transferred out of the home, Schomer attempted to help her father, with little success, although she was able to establish a home health provider to clean the home and provide some care to the protected person. Schomer learned that the protected person had not renewed his prescriptions and had gone multiple months without them. Although his feet were extremely swollen and often bloody from necrosis, he refused attempts to get him to a podiatrist. After the protected person "kick[ed] out" the nurse practitioner, Schomer testified that her father failed to follow the treatment plan that was established for his care. This led to medical insurance denials because he was not willing to follow care recommendations.

With no routine care provider's help, when Schomer would visit the protected person's home, she found feces and blood on the floors and garbage strewn around the home. Because of his foot condition, the protected person required the use of a walker or cane for his mobility, and he had a history of

falls.  The protected person admitted to Schomer that when he has fallen, he can lay on the ground for several hours until he is found and helped.  His home has two flights of stairs, which causes concern for his daughters.

In October 2024, the protected person fell at a gas station, which caused serious lacerations to his left leg.  The protected person refused care from the emergency personnel that arrived on scene.  Schomer later found blood all over the home, yet the protected person still refused help.  After calling for a wellness check, a firefighter and two sheriff deputies entered the protected person's home and determined that he should be hospitalized.  Once hospitalized, the protected person was diagnosed with staph and E. coli infections in his left leg.  With the protected person hospitalized, Schomer returned to his home and found food containers filled with urine and cigarette butts around the home.  She described the condition of the home as "horrible."  At the hearing, Schomer recommended that the protected person be moved to the veterans home as he could qualify for veterans benefits.

After concerns were called in to the Iowa Department of Health and Human Services (HHS), it investigated the report of self-denial of critical care, which was founded.  The report noted that the protected person would not take calls, would no-show for medical appointments and not follow through with care, did not believe he needed help, would not apply for benefits that could help him, had fallen and hit his head, and had withdrawn $6,000 from his bank account for an unknown reason.  He was urinating in milk jugs because his urinals were full and pouring the urine down the sink.  The summary concluded that the protected person was a "dependent adult."

In November 2024, Schomer petitioned to be appointed as the protected person's guardian and conservator, alleging her father was making

4

"risky decisions financially," that could lead to exploitation and coercion and that he was cognitively impaired. On top of that, Schomer alleged that her father was a danger to himself based upon his "denial of self-care." Schomer became "scared for his well-being" after the protected person rejected multiple attempts by her and social workers to help him. After discussing the guardianship and conservatorship petitions with her father in January 2025, the protected person became very angry and "very verbally aggressive" with Schomer; they have not had another conversation since that time.

The protected person underwent a cognitive screening on two occasions. In August 2024 and then again in January 2025, he scored on the lower end of the mild impairment range. Droll testified in her role as professional guardian and conservator that the protected person "demonstrated long periods of just non-compliance or ignoring his medical needs, rejecting the assistance that has been offered." Home-health nurses documented his failure to follow medical advice. Droll characterized the protected person's spending as "disorganized." She noted that on multiple occasions he had declined to participate in the processing for veterans benefits prior to his hospitalization. She concluded that the day-to-day assistance the protected person required would need to be paid privately, and based on her interactions with him, Droll determined the protected person would not be "inclined to pay those bills." Even though the current rehabilitation facility felt the protected person's cognitive ability allowed him to be able to function without the conservatorship or guardianship, their reports noted that he rarely leaves his recliner, does not bathe and keeps a urinal everywhere—making even his space there a dirty environment. Droll believed the veterans home offered a good living arrangement for the protected person. She stated:

5

> I don't believe [the protected person] needs to continue residing in a nursing home. I believe if he were able to demonstrate some compliance and ability to work with other people, he could go to an assisted living if he could balance his expenses. I also think it would be appropriate for him to go to the veteran's home.

The financial concerns were further complicated by the care required for N.D. Schomer managed the finances for N.D. under a financial power of attorney, but the couple shares assets, so coordination is required to offer support for both spouses. Droll and Schomer were able to coordinate those efforts.

In January 2025, while hospitalized for the wound to his left leg, further occupational and physical therapies were recommended, but the protected person declined. Plus, the protected person resisted the medical staff's recommendation that he not return home upon release due to a "concern for self-neglect."

A court visitor was appointed pursuant to Iowa Code section 633.562 (2025). After investigating and conducting interviews, the court visitor filed a written report concluding that the protected person did not require a guardian or a conservator. Instead, the court visitor opined that the protected person "was able to discuss his plan of action, discuss how to care for himself, and recall re[c]ent events and conversations. Due to this level of ability, the least restrictive outcome is dismissal of the petition." Yet, the court visitor did recognize the self-help concerns.

The protected person also testified at the hearing. There, he continued to voice a lack of understanding of his wife's condition when "they . . . took her away from me." He did not agree that N.D. was malnourished or sick, and he still wanted her returned home. While most of the bills were on auto-pay due to efforts of his wife or daughter, the protected person

indicated, as an example, that he would not know how to verify if his real estate taxes were paid. He was unable to testify about the amount of the monthly payment he receives from the government for his military pension. As for applying for veterans benefits, the protected person stated, "I have a choice to make a decision whether I want to work with the VA or whether I want to work with a consistory, someone else."

Other concerns were raised at the hearing. One related to a relationship that the protected person had formed with a twenty-year-old woman, who represented that she was an Irish celebrity. His attorney questioned him about the relationship at the hearing:

> Q. Okay. How do you know Allie Sherlock? A. She's a friend of mine over the internet.
>
> Q. Okay. How did you meet her? A. Well, she called me up one day.
>
> Q. Who—how did she get your phone number? A. Through the internet probably. I don't know.
>
> Q. Does she still call you? A. No, we haven't spoke for a while, but she says she's coming over.

The probate court also questioned the protected person about the nature of the relationship with his friend and whether the protected person had provided any financial support to the person. The protected person told the probate court he talks daily with the person on social media.

The protected person testified that he has been under the care of his family doctor, Dr. Brandon Madson, for thirty years. In an exhibit, Dr. Madson provided a letter indicating he had provided care to the protected person for thirteen years, listed several serious chronic conditions of the protected person including "non-healing foot wounds," and confirmed that

because the protected person had been refusing to take medications or accept medical care he "has become a danger to himself." Dr. Madson also opined that the protected person was "unable to care for or make decisions for himself."

After hearing the evidence and reviewing the exhibits, the probate court entered a thoughtful and detailed order that found:

> The Protected Person is conversant and adequately able to communicate his wishes and desires. The Court received evidence, verified by the Court Visitor's written report, that various staff members at the care facility where the Protected Person currently resides identify no concerns about the Protected Person's cognitive abilities. Such staff reports offered outside of Court are *not* consistent with the medical evidence or any of the in-court testimony offered. The Court finds it likely that the Protected Person *is* more conversant and functional than many of the other residents at the care facility where he is currently residing; however, that fact does not mean that the Protected Person himself demonstrates sufficient decision-making capacity to manage his own healthcare or financial decisions.
>
> The Protected Person is approximately 68 years old and diagnosed with mild neurocognitive disorder. The Protected Person has demonstrated consistent failure to attend to his basic self-care needs to the extent that such neglect has resulted in hospitalization and serious physical harm to himself. The Protected Person lacks insight into the seriousness of his self-neglect and evidence presented at hearing suggests the Protected Person, without the assistance of his spouse who now herself resides in a memory care unit, lacks the executive functioning skills to carry out most tasks necessary to provide for his own care or manage his own finances. The Court finds this to be the case, based on the Protected Person's past behavior, even if the Protected Person is at times capable of articulating the need and the intent to do so. The Court is mindful that the Protected Person's disease is progressive and that while intervention may alleviate some of the symptoms of the Protected Person's diagnosis, there is no "cure" available.
>
> The Court is extremely concerned regarding the testimony offered related to the dramatic circumstances under which the Protected Person's

spouse, [N.D.], was removed from the home shared with the Protected Person in June 2024. The Court finds that testimony offered by Angela Schomer related to this series of events to be credible. Ms. Schomer testified that her mother was removed from the home extremely malnourished and mostly unresponsive by the time that a firefighter conducting a well-check at the family's request carried her mother in his arms out of the home shared with the Protected Person to be immediately transferred to the hospital. The Protected Person denies any knowledge that his spouse's condition was so serious.

The Protected Person demonstrably lacked insight into the very serious nature of his spouse's medical needs as her health rapidly deteriorated and the Protected Person has actively demonstrated the same lack of insight into his own significant medical needs. Although the Protected Person has attempted to present that he is capable of providing for his own activities of daily living, the reality of the Protected Person's medical situation is that the Protected Person is not ambulatory and that he so neglected care for his wounds that his lower extremities are rotting. The Court is gravely concerned that allowing the Protected Person to direct his own medical care at this juncture would result in the Protected Person's death.

Related to the Protected Person's ability to manage his financial affairs, the record presented demonstrates that the Protected Person has taken no steps to apply for VA benefits to which he may be entitled and has further spent very large sums of money on food deliveries and other consumables to his home. While it has been the Protected Person's prerogative to spend his funds how he desires, the Protected Person's past decisions demonstrate a sincere lack of insight as it relates to how he will provide financially for his own needs and/or the needs of his spouse. The Protected Person has stated his desire to return to his own home with appropriate assistance but it is clear to this Court that the Protected Person does not have capacity to either arrange for or pay for appropriate care at this time.

Further, the probate court considered the appropriateness of a limited guardianship and limited conservatorship and found that neither could sufficiently address the protected person's needs. The protected person appeals from this ruling.

## II. Standard of Review.

In reviewing actions for the involuntary appointment of guardians and conservators, which are actions at law, our review is for errors at law. *In re Conservatorship of Deremiah*, 477 N.W.2d 691, 692 (Iowa Ct. App. 1991); *see* Iowa Code §§ 633.33, .551; Iowa R. App. P. 6.907. "Because our review is on error, the district court's factual findings are binding on appeal if supported by substantial evidence." *In re Guardianship of M.D.*, 797 N.W.2d 121, 127 (Iowa Ct. App. 2011); *see also* Iowa R. App. P. 6.904(3)(a) (same). "Evidence is substantial or sufficient when a reasonable mind would accept it as adequate to reach the same findings." *Deremiah*, 477 N.W.2d at 693.

## III. Analysis.

**A. Guardianship**. Arguing Schomer failed in her proof, the protected person contends he is not incompetent and no one could show that his decision-making capacity was so impaired that a guardian was necessary. Clear and convincing evidence "means there must be no serious or substantial doubt about the correctness of a particular conclusion drawn from the evidence." *In re M.S.*, 889 N.W.2d 675, 679 (Iowa Ct. App. 2016). The petitioner had the burden to show by clear and convincing evidence that the protected person was incompetent. Iowa Code § 633.551(1)–(2).

The basis for appointing a guardian is found in Iowa Code section 633.552(1) and is set out as follows:

> 1. On petition and after notice and hearing, the court may appoint a guardian for an adult if the court finds by clear and convincing evidence that all of the following are true:
>
> a. The decision-making capacity of the respondent is so impaired that the respondent is unable to care for the respondent's safety, or to

provide for necessities such as food, shelter, clothing, or medical care without which physical injury or illness may occur.

      b. The appointment of a guardian is in the best interest of the respondent.

While there was evidence that the protected person was conversant and only had a mild cognitive impairment, we look at his actions in addition to his words. Schomer offered substantial evidence of the protected person's decision-making capabilities in action. This included his failure to provide self-care, which resulted in a founded HHS report and was supported by the opinion of his long-time physician. The protected person's poor decision-making abilities created a dangerous health condition that could have resulted in significant permanent injury. The safety concerns related to mobility, food insecurity, and ongoing medical care, including medication management, further support the probate court's decision. Additionally, the protected person appeared to not understand the level of care that was necessary to keep him safe and healthy and instead was insisting on his independence. His history does not support his ability to make good decisions for his health or recognize his lack of abilities to address his basic care, such as hygiene, food security, and safety.

We give credit to the fact the district court had the benefit of viewing the witnesses, as the substantial evidence standard of review precludes us "from weighing the evidence or the credibility of the witnesses." *Deremiah*, 477 N.W.2d at 693 ("In case of doubt or ambiguity," we are obligated to "construe the findings to uphold, rather than defeat, the trial court's judgment."). Given the substantial evidence presented at the hearing, we find no error in the probate court's decision to establish a guardianship for the protected person.

11

**B. Conservatorship**. Although the protected person maintains that none of the evidence presented showed that he had any difficulty carrying out important financial decisions or had poor financial decision-making abilities, such as accumulating large debts, failure to manage his bank account, or paying out sums of money to inappropriate causes, the probate court determined a conservatorship was necessary. Prior to the filing of the petition, Schomer, as financial power of attorney for her mother, managed the couple's financial affairs. Once N.D. was transferred, Schomer continued that role but was not able to fully oversee the finances because the protected person now was handling some of the funds. The probate court noted his "disorganized" spending, and Schomer described the protected person's excessive use of funds for food services. Many of the bills were paid because of efforts that N.D. and Schomer put in place, but the protected person had little awareness of the financial concerns presented at the hearing.

To meet her burden, the petitioner had to show clear and convincing evidence to support the basis for an appointment of a conservator, as follows:

> 1. On petition and after notice and hearing, the court may appoint a conservator for an adult if the court finds by clear and convincing evidence that both of the following are true:
>
> a. The decision-making capacity of the respondent is so impaired that the respondent is unable to make, communicate, or carry out important decisions concerning the respondent's financial affairs.
>
> b. The appointment of a conservator is in the best interest of the respondent.

Iowa Code § 633.553(1).

While the evidence touched on the fear that the protected person might be scammed by people on the internet, we find more concerning the

lack of understanding that the protected person had of his finances and how that also interrelated with his wife's care. *See In re Guardianship of Evans*, No. 16-2192, 2017 WL 4570438, at *3 (Iowa Ct. App. Oct. 11, 2017) (finding ward's inability "to make and carry out important decisions regarding her financial affairs," as demonstrated by evidence of her ignorance of her bills and payment procedures supported the establishment of a conservatorship). The protected person did not think his wife was entitled to veterans benefits and had insisted on not accessing the veterans benefits that he clearly was entitled to use, instead continuing to use private funds for his care. How he would choose to spend his money often did not address his basic needs as he was not likely to pay for medical care or in-home support based on his history. Overall, the protected person did not have the decision-making skills to meet his financial needs. Thus, we find substantial evidence that the protected person was unable to address the important financial concerns that navigating his care required. His benefits, his monthly income and expenses, and budgetary decisions were outside of the scope of his decision-making, thus he required the help of a conservator.

We find no error in the establishment of a conservatorship given the substantial evidence provided.

**C. Limited Guardianship or Conservatorship.** The protected person also points out that the court failed to review whether a more limited guardianship or conservatorship was appropriate given his contention he was not incompetent. Yet, the protected person does not tell us what limitations might be appropriate under these facts. The probate court did consider the appropriateness of a limited guardianship or conservatorship. The court found that based upon the evidence, a limited guardianship would not meet the protected person's needs. *See* Iowa Code § 633.551(3)–(4) (requiring that

13

a "court *shall* consider" if a limited guardianship or conservatorship is appropriate (emphasis added)).

The appointed guardian recognized that the protected person would not require nursing home care and allowed for a less restrictive, but appropriate, placement at the veterans home. So, there were considerations about how restrictive the guardianship might be. Thus, we agree with the probate court that it is in the best interests of the protected person to have the expertise of both a conservator and guardian with the guardrails the probate court established for both his personal and financial safety.

**D. Abuse of Discretion**. Here, the protected person asserts that the court engaged in questioning that placed it in the role of an advocate. And, in that role, the court "demonstrated a bias in its questioning of the proposed guardian regarding finances, showing that it had formulated a decision on the ultimate question without hearing and considering all the evidence." The protected person also maintains the district court spent an inordinate amount of time on questioning the protected person about an alleged relationship with the Irish social media personality.

On our review, the discussion between the court and protected person was brief and did not address any non-relevant issues but simply sought clarification about whether any financial coercion had occurred. The probate court did not employ an "advocacy style," and we find the questioning was within the acceptable "leeway" we afford the court. *See Kuehl v. Sellner*, No. 19-1980, 2021 WL 3392813, at *6 (Iowa Ct. App. Aug. 4, 2021).

**IV. Conclusion.**

We find there was substantial evidence presented to meet the burden of showing by clear and convincing evidence that the protected person

requires the help of a guardian and conservator.  We affirm the ruling of the probate court.

**AFFIRMED.**